571 A.2d 1035

**COMMONWEALTH of Pennsylvania, Appellee,**

v.

**Mark David BREAKIRON, Appellant.**

Supreme Court of Pennsylvania.

Argued Sept. 25, 1989.

Decided March 14, 1990.

Richard E. Bower, Public Defender, Uniontown, for appellant.

Alphonse P. Lepore, Jr., Dist. Atty., Mark Morrison, First Asst. Dist. Atty., and Russell B. Korner, Jr., Asst. Dist. Atty., Uniontown, for appellee.

Before NIX, C.J., and LARSEN, FLAHERTY, McDERMOTT, ZAPPALA and PAPADAKOS, JJ.

## OPINION OF THE COURT

FLAHERTY, Justice.

Mark David Breakiron was convicted of first degree murder and robbery after a jury trial in the Court of Common Pleas, Criminal Division, Fayette County, Pennsylvania. Finding that the murder was accompanied by the aggravating circumstances of killing in the course of robbery and killing by means of torture, with no mitigating circumstances, the jury sentenced Breakiron to death. Post-trial motions were denied, and this Court assumed jurisdiction pursuant to 42 Pa.C.S. § 9711(h) and Pa.R.A.P. 1941, concerning direct appeals of death penalty cases.

The facts of this case are that during the early morning hours of March 23–24, 1987, Mark Breakiron murdered Saundra Marie Martin, an employee at Shenanigan's Lounge, by inflicting multiple stab wounds and beating her with a blunt instrument. He removed the victim's body along with her purse and cash from the bar. After carrying Martin's body outside and depositing it in the bed of his pickup truck, he drove to his grandparents' vacant house, where he took the body inside. Shortly thereafter, he attempted to hide the body in a nearby woods.

On March 24, 1987, state police were notified by the owners of Shenanigan's that Martin was missing. Investi-

gation revealed that the lounge was covered with blood-stains and that money bags containing business receipts were missing. Further investigation disclosed that Breakiron was seen alone in the bar with the victim late the previous evening after other customers left. Later that day, when police interviewed Breakiron, he voluntarily relinquished samples of what appeared to be blood from his truck and his clothing, although he did not confess to the murder. The blood samples obtained from Breakiron's truck and clothing matched the blood type of the victim, and Breakiron was arrested. On March 25, 1987, state police discovered Martin's body in a woods not far from the vacant house where Breakiron had taken her body prior to disposing of it.

Breakiron has alleged numerous trial errors. His first claim is that pre-trial publicity was so pervasive that he could not get a fair trial in Fayette County. Citing the language from *Commonwealth v. Frazier*, 471 Pa. 121, 369 A.2d 1224 (1977), Breakiron claims that the pre-trial publicity in his case was "so sustained, so pervasive, so inflammatory and so inculpatory as to demand a change of venue without putting [him] to any burden of establishing a nexus between the publicity and actual jury prejudice." Brief at 12. The publicity complained of contains descriptions of the crime as "grisly"; a photograph of Breakiron handcuffed and in police custody after he was charged with homicide; a characterization of the murder by the district attorney as "the most brutal I've ever seen"; the district attorney's comment that Breakiron "has not made any statement to date to implicate himself in the crime"; a story headlined "Few Willing to Talk About Troubled Hopwood Man," including the anonymous statement, "He's bad news"; a statement by the victim's father, "He's a cuckoo"; his uncle's comment, "Please tell them he's not my son"; and an article detailing Breakiron's criminal record, including charges of burglary, theft, felonious restraint, and recklessly endangering another person. The article also indicated that Breakiron had served a three year prison sentence and

that the recklessly endangering incident concerned Breakiron's binding and holding his mother and sister captive at knifepoint in his home.

In deciding whether pre-trial publicity was such that a new trial is required regardless of any showing of prejudice, this Court in *Commonwealth v. Romeri*, 504 Pa. 124, 470 A.2d 498 (1983), set out a number of factors for a reviewing court to consider, which we summarize as follows:

1. Whether pre-trial publicity was inherently prejudicial;

2. Whether pre-trial publicity saturated the community;

3. Whether there was a sufficient proximity in time between the publicity and the selection of a jury such that the community from which the jury was drawn did not have an opportunity to "cool down" from the effects of the publicity, thus making a fair trial in this community impossible.

If all of these questions are answered in the affirmative, a new trial is required. If any question is answered negatively, it was not improper to refuse the request for a change of venue.

■ First, under the *Romeri* schema, we must consider whether the pre-trial publicity was inherently prejudicial. The term "inherently prejudicial," as used in *Romeri* means:

publicity which is harmful to the accused, and which may or may not require a change of venue depending upon what effect it has had in the community from which prospective jurors are drawn.

504 Pa. at 131 n. 1, 470 A.2d at 501 n. 1. Factors to consider in the determination as to whether publicity is "inherently prejudicial" include:

whether the pre-trial publicity was, on the one hand, factual and objective, or, on the other hand, consisted of sensational, inflammatory and "slanted articles demanding conviction" ...; whether the pre-trial publicity revealed the existence of the accused's prior criminal

record; whether it referred to confessions, admissions or reenactments of the crime by the defendant; and whether such information is the product of reports by the police and prosecutorial officers.

*Id.,* 504 Pa. at 132, 470 A.2d at 502, citing *Commonwealth v. Casper,* 481 Pa. 143, 152–53, 392 A.2d 287, 292 (1977); *Commonwealth v. Buehl,* 510 Pa. 363, 376–77, 508 A.2d 1167 (1986). In the articles at issue in this case, unquestionably the reporting tended to inflame public opinion against Breakiron, and thereby to call for the conviction of a "bad" person; it reported Breakiron's prior criminal record; and it arguably commented on Breakiron's protected silence by quoting the district attorney as stating that Breakiron had made no inculpatory statements. Such publicity is "inherently prejudicial" as that term is used in *Romeri.*

Once inherently prejudicial publicity is established, our next inquiry is "whether such publicity has been so extensive, so sustained and so pervasive that the community must be deemed to have been saturated with it." *Romeri, supra,* 504 Pa. at 134, 470 A.2d at 503. And finally, even if there has been inherently prejudicial publicity which has saturated the community, we must also consider whether there has been a cooling-off period which would significantly dilute the prejudicial effects of the publicity. *Id.*[1]

■ In the present case, almost a year elapsed between the time of publication of news stories on Breakiron and the selection of the jury. Additionally, an examination of the

1. In testing whether there has been a sufficient cooling period, a court must investigate what the panel of prospective jurors has said about its exposure to the publicity in question. This is one indication of whether the cooling period has been sufficient. Thus, in determining the efficacy of the cooling period, a court will consider the direct effects of publicity, something a defendant need not allege or prove.

Although it is conceivable that pre-trial publicity could be so extremely damaging that a court might order a change of venue no matter what the prospective jurors said about their ability to hear the case fairly and without bias, that would be a most unusual case. Normally, what prospective jurors tell us about their ability to be impartial will be a reliable guide to whether the publicity is still so fresh in their minds that it has removed their ability to be objective. The discretion of the trial judge is given wide latitude in this area.

772 pages of voir dire testimony indicates that none of the jurors selected had more than vague recollections of news coverage of the Martin murder; at least two of them were totally unaware of any newspaper coverage; and none had been so affected by the pre-trial publicity that he or she was unable to hear the evidence in the case fairly and impartially. Under these circumstances, even though some of the news coverage was inherently prejudicial, there was an adequate cooling-off period to enable an impartial jury to be empaneled.[2]

██ Breakiron argues next that the trial court erred in failing to quash certain search warrants and suppress the evidence which was obtained when they were executed. He claims that the affidavits supporting these warrants were defective in that they did not set forth allegations of Breakiron's criminal activity.

In *Commonwealth v. Gray*, 509 Pa. 476, 503 A.2d 921 (1986), this Court adopted a "totality of circumstances" test to evaluate the validity of search warrants:

> The task of the issuing magistrate is simply to make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him, including the "veracity" and "basis of knowledge" of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place. And the duty of a reviewing court is simply to ensure that the magistrate had a "substantial basis for ... conclud[ing] that probable cause existed."

*Id.*, 509 Pa. at 484, 503 A.2d at 925, quoting *Illinois v. Gates*, 462 U.S. 213, 238–39, 103 S.Ct. 2317, 2332, 76 L.Ed.2d 527 (1983). In the present case, the affidavits in question state that Saundra Martin was missing; that blood stains were found on the floor of the bar where Martin worked and where she was last seen; that money was also

---

2. We do not address the issue of whether the community was saturated by the publicity, for reaching that issue is not necessary to a decision. Even if saturation of the community were established, the cooling-off period was sufficient to allow an impartial jury to be empaneled.

missing from Martin's place of employment; that Breakiron was the last customer in the bar where Martin worked at around midnight of March 23, when Martin disappeared; that around 1:00 to 1:30 a.m., March 24, 1987, only two vehicles remained in the bar parking lot where Martin worked, Martin's car and a truck similar to that owned by Breakiron; and that after Breakiron consented to a search of his truck, state police found what appeared to be blood stains on the interior and in the bed of the truck. We have no difficulty in concluding that these allegations provided a substantial basis for the issuance of search warrants for Breakiron's home, his person, and his truck.

Next, Breakiron claims that the trial court erred in determining that any statements made to a psychiatrist would be admissible into evidence against him even if he did not offer the defense of insanity at trial. Breakiron asserts that this statement offered by the trial court caused him to refuse to discuss the crime with psychiatrists and precluded him from using an insanity defense because the court could have allowed any statement he made to be used against him.[3]

The record does not support Breakiron's claim. Although appellant fails to direct our attention to any part of the record where the trial court made a ruling that anything Breakiron told appellant would be admissible into evidence against him, we have found two colloquies with the motions judge on February 29 and March 2, 1988, approximately six weeks before trial, in which the court stated that when a defendant puts his sanity in issue, and the psychiatrist is going to testify, the physician-patient privilege does not apply. The court *questioned* counsel as to whether Breakiron's statements to the psychiatrist could not be used against him at trial, regardless of whether the defense used the psychiatric report, but did not issue a ruling to that

3. No testimony was offered by either side concerning psychiatric examinations.

effect.[4]

4.  On February 29, 1988 the following exchange took place between the court and counsel:

> DEFENSE COUNSEL. Mr. Breakiron was informed [by the psychiatrist] that anything he said would be made available to the District Attorney's office, the courts, and that it would be public information and that it would not be a privileged discussion with a psychiatrist. Additionally, he was under the belief that it would be used against him if he informed the psychiatrist of anything. I have also talked to Dr. Adamsky [the psychiatrist], not on this case, but on prior cases where he has informed defendants that anything that they say can and will be used against them in a court of law, and he tells them that it is not a psychiatrist-client privilege. I would present both motions to the court at this time.
>
> THE COURT. That's what the law is *if he's going to testify.*
>
> DEFENSE COUNSEL. Well, your Honor, to determine whether or not a person would be competent to stand trial or to determine whether the person were insane at the time of the crime, Dr. Adamsky tells the defendants that, and I have had several run-ins with him in regard to this, that anything that they would tell him in the way of admissions to the crime, that would be used against that defendant in a court of law. That is not the purpose of evaluation. The evaluation is to determine whether a defendant is insane at the time of a crime or is competent to stand trial.
>
> THE COURT. But is that the law?
>
> DEFENSE COUNSEL. Your Honor, I don't believe that the law allows a psychiatrist to divulge privileged information which he obtains during the course of an evaluation. It is protected by the privilege, your Honor.

On March 2, 1988 the exchange between the court, Breakiron and counsel was as follows:

> THE COURT. We have something in here to the effect that you don't think this first evaluation was valid because you didn't—you weren't truthful to him. Is that true?
>
> MR. BREAKIRON. Mr. Adamski [the psychiatrist] told me that anything that took place in that evaluation the prosecution had access to.
>
> THE COURT. That's going to be so in any evaluation. The psychiatrist is going to have to tell you that. *Once you put your mental condition in the case,* and this kind of situation exists, then he is going to tell you that.
>
> DEFENSE COUNSEL. Your Honor, I don't think that that's the way that I understand it. Having discussed previous cases with Dr. Adamski, I think what Mr. Breakiron means is that he thought that anything he said would be used against him. If the evaluation would come back that he was sane, and let's just for argument's sake say that he had admitted to doing this, then that would be permitted to be used, and that's the way that I believe Mr. Breakiron understood that, that anything he said could be and would be used against him in a court of law.
>
> THE COURT. Well, couldn't it be?

Under our scheme of criminal justice, a defendant is permitted to raise the defense of insanity, and he is permitted, subject to the requirements of Pa.R.Crim.P. 305, to undergo a psychiatric examination and to introduce the results of that examination into evidence as part of his case. Rule 305 provides:

In all court cases, if the Commonwealth files a motion for pretrial discovery, the court may order the defendant, *subject to the defendant's rights against compulsory self-incrimination,* to allow the attorney for the Commonwealth to [discover] ... results or reports of ... mental examinations ... *which the defendant intends to introduce as evidence in chief, or which were prepared by a witness whom the defendant intends to call at the trial,* when results or reports relate to the testimony of that witness, provided the defendant has requested and received discovery under paragraph B(1)(e)....

DEFENSE COUNSEL. No, it could not be.
THE COURT. You don't think it could be? You had better read some cases on it. There is no privilege between physician and patient where it applies *where a person's mental competency is brought into issue.*
DEFENSE COUNSEL. I understand that. I am talking about the situation of admitting to a crime. That is privileged. We are talking about his mental state.
THE COURT. Well, I am not going to debate the subject, but I think that *once you put your mental competency in question,* I think on that issue you are going to find that the law is not as clear-cut as you're saying it is.

(Emphasis added.) It is noteworthy not only that the court never made a ruling on the admissibility of Breakiron's statements to the psychiatrists under any and every condition, but also that the court's statements concerning admissibility of the statements to psychiatrists "once you put your mental competency in question" are essentially correct.

The problem arises only in that the court seems not to be responsive to the different claim that a new situation arises when the defendant intends to put his sanity into question, but then changes his mind and decides not to put his sanity at issue and does not want the Commonwealth to see the report of what he has told the psychiatrist. The question then is whether the Commonwealth may see the report pursuant to Rule 305, or whether the defendant's statements to psychiatrists, at that point, when the insanity is no longer an issue in the case, become privileged.

Pa.R.Crim.P. 305 C(2)(a). (Emphasis added). Thus, pursuant to Rule 305, a criminal defendant must be warned against the possibility that what he says to the psychiatrist will be used against him (the defendant's right to be protected against compulsory self-incrimination). Further, the Commonwealth, subject to the court's exercise of its sound discretion, may discover the results of these examinations or reports of such examinations, but only when the defendant intends to use these materials in his case in chief. The necessary implication of this rule allowing the Commonwealth access to these reports is that if the defendant changes his mind about using the reports after they have been made available to the Commonwealth pursuant to Rule 305, the Commonwealth may not introduce the reports into evidence or refer to the reports if the defendant does not.

Breakiron's argument, fundamentally, is that allowing the Commonwealth access to the results of psychiatric examinations which he indicates that he intends to use, but then decides not to use in his case in chief, chills his right to investigate the defense at all. We disagree. First, as we have indicated above, the Commonwealth may not introduce these materials into evidence or otherwise make known their existence at trial unless the defendant himself uses the reports. Second, although it is conceivable that the Commonwealth might exploit the reports to develop evidence that it would otherwise not have discovered (should the defendant admit to the psychiatrist, for example, that he committed the crime and that he hid a weapon in a particular location), the supplementary evidence also would be subject to suppression upon the defendant's motion. *See Wong Sun v. United States,* 371 U.S. 441, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963); *see also Commonwealth v. Brooks,* 468 Pa. 547, 364 A.2d 652 (1976). If the Commonwealth may not use any such evidence at trial, the existence of the evidence is not impermissibly harmful to the defendant. The Commonwealth frequently has in its possession inculpatory evidence which is inadmissible except in special circumstances, and this is not deemed to violate the rights of a

defendant. A salient example is a record of prior crimen falsi offenses—inadmissible unless a defendant chooses to testify at his trial.

The defendant's claim, therefore, that the trial court, in effect, chilled his right to an insanity defense, is meritless. The trial court made no ruling on the admissibility of psychiatric reports at all. The court merely asked questions about their admissibility. The defendant may not bootstrap himself into a new trial by abandoning the insanity defense, claiming he did not want the Commonwealth to see reports needed to investigate the viability of the defense, and blaming his abandonment on a ruling that was never made.

▌ Next, appellant argues that no evidence was presented to support the finding that the killing was committed by means of torture, citing the definition of torture set forth in *Commonwealth v. Pursell*, 508 Pa. 212, 239, 495 A.2d 183, 196 (1985): "the infliction of a considerable amount of pain and suffering on a victim which is unnecessarily heinous, atrocious, or cruel manifesting exceptional depravity." In our view, the evidence was sufficient to support the jury's conclusion that the aggravating circumstance of torture was present. As this Court stated unanimously in *Commonwealth v. Steele*, 522 Pa. 61, 77, 559 A.2d 904, 912 (1989), "[a] jury may determine from the manner of death that other reasons than overcoming resistence or silencing a victim were at play in the killing."

Dr. Manuel Pelaez, the pathologist who performed the autopsy on the victim, testified that she suffered multiple injuries on her head, neck, trunk, and extremities. There were multiple bruises around the eyes. There was a laceration of the right eyebrow and there were several cuts and contusions and lacerations in the left ear and left side of the head. Some of these injuries were caused by a blunt force; others by a sharp instrument. Her skull was fractured. A stab wound penetrated through the left ear into the brain. There were several slash wounds on the right side of the neck, several slash wounds on the left side of the neck, and

one deep stab wound which severed the jugular vein and carotid artery. In the chest and abdomen of the victim, there were eighteen stab wounds. These wounds penetrated the right lung, the left lung, the liver, the stomach, and the left kidney. Two ribs were fractured by the knife. There were numerous cuts and slashes on both hands which were described as defensive wounds, indicating some attempt by the victim to grab or protect herself with her hands from the knife. There was a large cut in the right elbow. There were multiple bruises of the knees and forearms and chest. The cause of death was internal and external bleeding secondary to the multiple stab wounds, and the blunt force injuries to the head contributed to the death.

A fellow inmate who discussed the crime with appellant following his arrest testified that appellant told him that he first struck the victim with an ashtray at the bar, then used a knife, then took her to "his pap's house" where he "finished her off."

This was a sufficient basis for the jury to conclude that appellant inflicted injuries far beyond those necessary to kill the victim, and that the murder was committed by means of torture.

Next, Breakiron asserts that the evidence in the case was insufficient to sustain a conviction of first degree murder when Breakiron's testimony in the case indicated that he was voluntarily intoxicated. Evidence of voluntary intoxication or drugged condition may be used to reduce murder from a higher degree to a lower degree. 18 Pa.C.S. § 308. The theory of this rule of law is that a person overwhelmed by the effects of alcohol or drugs cannot form a specific intent to kill. As this Court stated in *Commonwealth v. England*, 474 Pa. 1, 375 A.2d 1292 (1977):

Where the question of intoxication is introduced into a murder case its only effect could be to negate the specific intent to kill which is required for a finding of murder of the first degree.... If intoxication does render an accused incapable of forming the necessary intent the result

is to reduce the crime to a lesser degree of murder. In no event does the reduction change the character of the crime from murder to manslaughter.

*Id.,* 474 Pa. at 19–20, 375 A.2d at 1301. Further, in order for intoxication to reduce murder from a higher to a lower degree, it must be proven that the actor was overwhelmed to the point of losing his faculties and sensibilities. *Commonwealth v. Reiff,* 489 Pa. 12, 15, 413 A.2d 672, 674 (1980).

■ In this case, although Breakiron testified that he drank a number of sixteen ounce beers and one or more shots of whiskey during the evening of March 23–24, 1987, and that he "had a 'buzz' on," he also testified that he had no trouble driving, that he drove away from the bar, then returned to pick up the body of the victim, that he picked up the money bags and the victim's purse while he was there, that he hauled the victim's body in the bed of his truck to an empty house, took it inside, put it on a tarp, then took the body to a woods where he attempted to conceal it. Because there was evidence of intoxication in the case, the trial court instructed the jury on voluntary intoxication, but it is apparent the jury did not believe that Breakiron's faculties and sensibilities were so overwhelmed with alcohol that he could not form the specific intent to kill. It is equally obvious that such a determination was for the jury to make, that the jury based its determination at least in part on evidence introduced by Breakiron himself, and that, for these reasons, there was no error in sustaining the first degree murder conviction.

■ Breakiron's next assertion of error is that there was insufficient evidence of robbery to sustain a conviction for that crime. The essence of Breakiron's claim is that while he testified that he stole bags of money and the victim's purse, these items were stolen after the victim was dead, and he, therefore, cannot be said to have inflicted serious bodily injury on the victim in the course of committing a theft, which is required by the robbery statute. 18 Pa.C.S.

§ 3701.[5]  He also asserts that there is no evidence that the victim had control over the money bags.

As this Court has stated:

It is hornbook law that the test of the sufficiency of the evidence—irrespective of whether it is direct or circumstantial, or both—is whether, accepting as true all the evidence and all reasonable inferences therefrom, upon which if believed the jury could properly have based its verdict, it is sufficient in law to prove beyond a reasonable doubt that the defendant is guilty of the crime or crimes of which he has been convicted.

*Commonwealth v. Frye,* 433 Pa. 473, 481, 252 A.2d 580, 584 (1969).  The victim's employer testified that the victim was the only employee on duty the night she was murdered, that she was responsible for closing up, and that she was supposed to put the money bags in a special hiding place when she closed.  It was within the jury's province to infer from this that Martin had custody of the money belonging to the bar.

Breakiron testified that when he was alone in the bar with the victim, he put his arm around her, then he was struck on the head and fell to the floor.  When he woke up, he found the victim lying next to him with a knife stuck in her back.  He then left the bar and drove off in his truck, but came back, stole the money bags and the purse, and carried the victim's body to his truck and ultimately to its

---

**5.**  18 Pa.C.S. provides as follows:

**§ 3701.  Robbery**

(1) A person is guilty of robbery if, in the course of committing a theft, he:

    (i) inflicts serious bodily injury upon another;

    (ii) threatens another with or intentionally puts him in fear of immediate serious bodily injury;

    (iii) commits or threatens immediately to commit any felony of the first or second degree;

    (iv) inflicts bodily injury upon another or threatens another with or intentionally puts him in fear of immediate bodily injury;  or

    (v) physically takes or removes property from the person of another by force however slight.

(2) An act shall be deemed "in the course of committing a theft" if it occurs in an attempt to commit theft or in flight after the attempt or commission.

makeshift grave in the woods. Certainly the jury was entitled to discredit this seemingly implausible statement of events. From the physical evidence that blood stains matching the blood of the victim were found on Breakiron's clothes and truck, and that in Breakiron's truck was a recently washed knife which could have produced stab wounds of the type suffered by the victim, it was proper for the jury to infer that Breakiron killed Martin in the course of a robbery. *Accord Commonwealth v. Lovette*, 498 Pa. 665, 670, 450 A.2d 975, 977 (1982) ("The fact that the evidence establishing a defendant's participation in a crime is circumstantial does not preclude a conviction where the evidence coupled with the reasonable inferences drawn therefrom overcomes the presumption of innocence.")

The next claim is that it was error to allow the district attorney to discuss the testimony of a Commonwealth witness with that witness while that person was on the witness stand. At one point during the trial on April 8, 1988, during a sidebar conference in which defense counsel asked for an offer of proof, the court suggested that the attorney for the Commonwealth confer with a state police officer for a minute to confirm the chronology of his investigation. In another incident, later in the trial, defense counsel objected to any repetition of this procedure, and the court directed the attorney for the Commonwealth to consult briefly with his witness outside of the presence of the jury.

Breakiron neither cites caselaw on this point nor explains how he was prejudiced by the Commonwealth's brief conference with one of its witnesses. In the absence of a showing of prejudice, the claim is denied.

The next assertion of error is that the jury erred in determining that no mitigating circumstances existed and in failing to determine that these mitigating circumstances outweighed the aggravating circumstances. The jury found as aggravating circumstances that the murder was committed during the course of a robbery and that it was committed by means of torture. It found no mitigating circumstances. Breakiron argues that the jury should have

found in mitigation that he was under extreme mental or emotional disturbance, his age (twenty-five), and "other evidence of mitigation." [6] Presumably this other evidence

6. Pennsylvania's statutory scheme for sentencing in first degree murder cases is set out at 42 Pa.C.S. § 9711, and provides in pertinent part:

> . . . .
> (c) **Instructions to jury**
> (1) Before the jury retires to consider the sentencing verdict, the court shall instruct the jury on the following matters:
> (i) the aggravating circumstances specified in subsection (d) as to which there is some evidence.
> (ii) the mitigating circumstances specified in subsection (e) as to which there is some evidence.
> (iii) aggravating circumstances must be proved by the Commonwealth beyond a reasonable doubt; mitigating circumstances must be proved by the defendant by a preponderance of the evidence.
> (iv) the verdict must be a sentence of death if the jury unanimously finds at least one aggravating circumstance specified in subsection (d) and no mitigating circumstance or if the jury unanimously finds one or more aggravating circumstances which outweigh any mitigating circumstances. The verdict must be a sentence of life imprisonment in all other cases.
>
> . . . .
> (d) **Aggravating circumstances.** Aggravating circumstances shall be limited to the following:
>
> . . . .
> (6) The defendant committed a killing while in the perpetration of a felony.
>
> . . . .
> (8) The offense was committed by means of torture.
>
> . . . .
> (e) **Mitigating circumstances.** Mitigating circumstances shall include the following:
> (1) The defendant has no significant history of prior criminal convictions.
> (2) The defendant was under the influence of extreme mental or emotional disturbance.
> (3) The capacity of the defendant to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was substantially impaired.
> (4) The age of the defendant at the time of the crime.
> (5) The defendant acted under extreme duress, although not such duress as to constitute a defense to prosecution under 18 Pa.C.S. § 309 (relating to duress), or acted under the substantial domination of another person.
> (6) The victim was a participant in the defendant's homicidal conduct or consented to the homicidal acts.
> (7) The defendant's participation in the homicidal act was relatively minor.

would include Breakiron's alcohol and drug problems, his unsatisfactory home life, his voluntary intoxication at the time of the killing, his remorse, and his desire to commit suicide, all of which were presented to the jury.

As this Court stated in *Commonwealth v. Fahy*, 512 Pa. 298, 317, 516 A.2d 689, 698 (1986), "Under our legislative scheme, it is exclusively a jury question whether any mitigating factor is to be given determinative weight when balanced with other mitigating and aggravating circumstances...." *Accord Commonwealth v. Moser*, 519 Pa. 441, 449, 549 A.2d 76, 80 (1988). It is axiomatic that once a jury has been properly instructed on the nature of aggravating and mitigating circumstances as defined in the statute, as well as on the statutory scheme for balancing one against the other, it is not for reviewing courts to usurp the jury function and to substitute their judgment for that of the jury. The claim has no merit.

■ Next it is asserted that it was error for the trial court to have allowed the Commonwealth to question a witness, Mark Blair, concerning one of Breakiron's favorite spots in the woods, and then to have allowed the Commonwealth to introduce evidence that Mark Blair took police to this area. Blair testified that he encountered Breakiron at Lick Hollow Park on the evening of March 23, 1987, while Blair and some friends were sitting around a campfire. During the conversation that followed, Breakiron described his favorite spot to Blair, as "an area where there is a lot of caves and caverns in the woods there approximately fifty to one hundred yards away from" a brown electrical insulator. Blair also testified that he knew the spot and had been there. State police testified that Blair subsequently took them to this area.

The substance of Breakiron's claim seems to be that since Breakiron did not physically take Blair to the area in question, Blair had no definite knowledge of what Breakiron was referring to in his discussion of the favorite spot.

(8) Any other evidence of mitigation concerning the character and record of the defendant and the circumstances of his offense.

Whether this was true, however, is a question of credibility, not of admissibility. Blair testified that he knew of his own experience the place described by Breakiron, and a witness can always testify as to his personal knowledge and observation. It is for the jury to decide whether it believes his testimony.

Next, Breakiron argues that the trial court erred in failing to reconsider his sentence of five to ten years imprisonment plus fines on the robbery conviction. The first prong of this argument is that it was improper to sentence Breakiron on both the murder and the robbery convictions. While it is true that in *Commonwealth v. Tarver*, 493 Pa. 320, 426 A.2d 569 (1981), this Court held that robbery was a constituent offense of felony-murder, as that crime was defined under the 1939 Penal Code, the present case involves murder of the first degree, not felony-murder. Robbery is not a constituent offense of first degree murder and the trial court was not in error, therefore, in sentencing on both convictions. *See also Commonwealth v. Leon Williams*, 521 Pa. 556, 559 A.2d 25 (1989), *Commonwealth v. Weakland*, 521 Pa. 353, 555 A.2d 1228 (1989). With respect to the second prong of his argument, concerning the robbery sentence, the trial court indicated that it had considered the nature of the offense, the pre-sentence report, his prior criminal record, and his need for rehabilitation. These were proper considerations for the sentencing court and there is nothing of record to indicate that the sentencing court abused its discretion in imposing sentence. The lower court was not, therefore, in error in refusing to modify its sentences.

Finally, pursuant to the mandate of *Commonwealth v. Zettlemoyer*, 500 Pa. 16, 62, 454 A.2d 937, 961 (1983), and 42 Pa.C.S. § 9711(h)(3)(i)–(iii), this Court must review Breakiron's sentence of death as to whether it was a product of passion, prejudice, or any other arbitrary factor; whether the evidence fails to support at least one aggravating factor; and whether the sentence of death is excessive or disproportionate to the penalty imposed in similar cases.

The record supports the jury's determination that the killing was committed by means of torture and that it was committed while in the perpetration of robbery. There is no evidence of passion, prejudice, or other arbitrary factor; and our review of the data supplied by the Administrative Office of Pennsylvania Courts for other cases involving similar aggravating circumstances, without mitigating circumstances, indicates that there is no disproportion in the sentence.

For these reasons, the judgment of sentence is affirmed.[7]

NIX, C.J., files a dissenting opinion in which ZAPPALA, J., joins.

## DISSENTING OPINTON.

NIX, Chief Justice, dissenting.

I cannot agree with the majority's resolution of Mr. Breakiron's complaint that he was denied the opportunity to have a determination as to his incompetency which would, of course, include his competency to stand trial and assist in his defense as well as the availability of an insanity defense. This complaint is not frivolous since appellant had been hospitalized for psychiatric treatment in 1984, had psychiatric problems in his youth, and has been treated for alcohol and drug problems in Alcoholics Anonymous and Narcotics Anonymous. It further appears appellant had once bound and held his mother and sister captive at knife point.

At the time of the killing of Miss Saundra Marie Martin, appellant sustained a cut on his forehead; he claimed he had been struck on the head whereupon he blacked out. The record further indicates appellant's recollection of the circumstances surrounding the incident was hazy and at times incoherent.

7. The prothonotary of the western district is directed to transmit to the Governor as soon as possible the full and complete record of all proceedings below and of review of this Court, as required by 42 Pa.C.S. § 9711(i).

Prudent counsel, under these facts, was compelled to have his client psychiatrically evaluated. Requests for such an evaluation were made under the Mental Health Procedures Act, 50 P.S. § 7101, *et seq.*, and two orders were entered by two different judges,[1] neither of whom were the trial judge. The record contains no report from examining psychiatrists as a result of those orders.

In resolving the issue this Court, as well as counsel, analyzes the matter from the perspective of the Pennsylvania Rules of Criminal Procedure relating to discovery. Pa. R.Crim.P. 305. However, what is pertinent is the disuse of the statutory process enacted to cover precisely this type of circumstance; to wit, Article IV of the Mental Health Procedures Act ("the Act"), *supra*, entitled "Determinations Affecting Those Charged With Crime or Under Sentence." Section 7402 of that Article of the Act is concerned with incompetence to proceed on criminal charges and lack of criminal responsibility as a defense.

Given Mr. Breakiron's mental health history, his counsel was entitled to have a determination as to appellant's capacity to stand trial[2] as well as a determination of whether a defense of insanity was available.[3] Mr. Breakiron's concern

1. The order of both pre-trial judges read:
   [U]pon consideration of the foregoing motion, Fayette County Mental Health is hereby directed to evaluate the defendant herein, to determine whether defendant is competent to stand trial and assist counsel with his defense, to determine if defendant was competent at the time of the incident, and to determine whether defendant is in need of treatment.

2. Section 7402(e)(4)(ii) states that a psychiatric report shall be submitted to the court and shall include "an opinion as to his capacity to understand the nature and object of the criminal proceedings against him and to assist in his defense[.]"

3. Section 7402(e)(4)(iii) and (iv) state that the psychiatric report shall include:
   (iii) when so requested, an opinion as to his mental condition in relation to the standards for criminal responsibility as then provided by law if it appears that the facts concerning his mental condition may also be relevant to the question of legal responsibility; and
   (iv) when so requested, an opinion as to whether he had the capacity to have a particular state of mind, where such state of mind is a required element of the criminal charge.

about the disclosure of his communications during such examinations are directly addressed by section 7402(e)(3) of the Act.[4] The presence of competent counsel at the time of the examination insures a defendant will be protected from self-incrimination. The Act's explicit language, *"Nothing said or done by such person during the examination may be used as evidence against him in any criminal proceedings on any issue other than that of his mental condition"* meets Mr. Breakiron's concern and is inapposite to the psychiatrist's statement and the pre-trial ruling of the court.

Appellant objected to the court-appointed psychiatrist because he felt prejudiced by the psychiatrist's remarks that anything he said could be used against him. That objection, in my opinion, was substantial since the psychiatrist was in error. Appellant, under section 7402(f) of the Act, could have chosen a private psychiatrist at the expense of the mental health and mental retardation program of the locality.[5]

Counsel for appellant made specific reference to the Act in the certification supporting the petition that was filed on his client's behalf. Notwithstanding, counsel proceeded without any reference to the provisions of the Act although the Act addressed the issue in question. Clearly with a history such as Mr. Breakiron's and no psychiatric report or pre-trial determination of competency, we cannot say with certainty that appellant was competent to stand trial or that

4. Section 7402(e)(3) states:
    The person shall be entitled to have counsel present with him and shall not be required to answer any questions or to perform tests unless he has moved for or agreed to the examination. Nothing said or done by such person during the examination may be used as evidence against him in any criminal proceedings on any issue other than that of his mental condition.

5. Pertinent language in § 7402(f) is:
    [W]henever a defendant who is financially unable to retain such expert has a substantial objection to the conclusions reached by the court-appointed psychiatrist, the court shall allow reasonable compensation for the employment of a psychiatrist of his selection, which amount shall be chargeable against the mental health and mental retardation program of the locality.

an insanity defense was inappropriate. It was vital that these avenues be explored when properly preparing the case. Failure to employ the relevant provisions of the very Act counsel cited as authority to the Court for the requested examination is, in my judgment, patent ineffective assistance of counsel. By not using the law enacted for such a situation, counsel abandoned his first and foremost duty to ascertain his client's ability to stand trial. By not exercising appellant's rights under the Act for counsel to be present and to obtain a private psychiatrist, counsel lost the important determination of whether an insanity defense to the charges was appropriate. According to this record counsel was blatantly remiss. We cannot and must not ignore the abrogation of appellant's state and federal constitutional right to effective representation.

I am mindful the question of ineffective assistance of counsel was not raised by the parties. Nonetheless such a grievous failure to provide effective representation in a capital case prohibits the applicability of any concept of waiver. To do otherwise would undercut our entire philosophy and system of jurisprudence.

The taking of a human life, even by the state, is no light undertaking. Rule 2189 of the Pennsylvania Rules of Appellate Procedure reflects an acknowledgement of the graveness of capital cases when it provides for eight copies of the entire record to be filed in this Court: one for each justice and one for the Governor. It is understood we are to examine the total record for constitutional compliance. Additionally, the ineffectiveness of counsel is so clear the matter should be remanded and new counsel appointed to develop the argument.

ZAPPALA, J., joins this dissenting opinion.