651 A.2d 1101

COMMONWEALTH of Pennsylvania, Appellee,

v.

James JONES, Appellant.

Supreme Court of Pennsylvania.

Submitted Oct. 22, 1990.

Decided Dec. 28, 1994.

Reargued Jan. 25, 1994.

224

Michael Giampietro, Philadelphia, for James Jones.

Catherine Marshall, Philadelphia, for Com.

Hugh J. Burns, Jr., Philadelphia, Robert A. Graci, Harrisburg, for Atty. Gen.

Before NIX, C.J., and FLAHERTY, ZAPPALA, PAPADAKOS, CAPPY, CASTILLE and MONTEMURO, JJ.

## OPINION

ZAPPALA, Justice.

This is a direct appeal pursuant to 42 Pa.C.S. §§ 722((4) and 9711(h). The appellant, James Jones, was found guilty of two counts of first degree murder, 18 Pa.C.S. § 2502, two counts of arson endangering persons, 18 Pa.C.S. § 3301(a), and one count of arson endangering property, 18 Pa.C.S. § 3301(c). Following the hearing to determine the sentences for the first degree murder verdicts, the jury determined that there were three aggravating circumstances which outweighed one mitigating circumstance and rendered a sentencing verdict of death as to each murder. The court later imposed a sentence of ten to twenty years imprisonment as to one arson conviction, consecutive to one death sentence and concurrent with the other, and suspended sentence as to the other arson convictions.

This case arises out of the deaths of two young women found bound and gagged and burned to death in the basement of a house in Philadelphia. The appellant lived on the second floor of the house, which was owned by Moses Brown. The basement of the house was used as a speakeasy.

Around midnight on July 30, 1980, screams were heard coming from the house and smoke was seen coming from the basement windows. The appellant was seen by neighbors running out of the front door. The hair on his face and head was singed and he was extensively burned. Examination by medical personnel at the scene and later at the hospital revealed second and third degree burns over forty percent of the appellant's body, particularly his face, neck, and back.

The appellant's account of the events to neighbors, medical personnel, and police was essentially that two men, one of whom he recognized but did not know by name, came into the

basement and ordered him and the two girls to lie down on the floor. The appellant laid face down behind a bar, then saw and heard nothing until there was an explosion. He got up, found the basement on fire, and was burned running through the fire up the cellar stairs.

The Commonwealth introduced testimony of a neighbor who had been sitting across the street, that no one had entered or left the house in the fifteen or twenty minutes before the appellant was seen leaving. He also testified that only Moses Brown was seen leaving after the appellant. The Commonwealth also introduced evidence that the back door of the house was bolted and locked from the inside and the windows were barred, leaving the front as the only means of entrance and exit.

The Commonwealth's fire expert offered the opinion that the victims had been seated on chairs at the bottom of the steps, bound to each other and to the post at the bottom of the stairs, then doused with gasoline and set on fire. From the positions of the bodies, chairs, post, etc., he indicated that the victims had been conscious when set on fire and had struggled to get free. He also testified that in his opinion the fire began as an intense fireball caused by the ignition of the gasoline vapors, which died down quickly leaving the bodies and surrounding materials burning. The Commonwealth's medical expert gave his opinion that the appellant's burns—to his face, right side, and back—were consistent with his having been standing near such a fireball then turning to run away. Additionally, a pair of glasses of the type worn by the appellant was found on the third step from the bottom.

Our review of the record as highlighted above persuades us that the evidence was unquestionably sufficient to support the verdicts of first degree murder.

The appellant first argues [1] that the court erred in failing to suppress a number of statements that he gave to

1. Notice of Appeal was filed in June of 1985. Thereafter, Jones's counsel, who had been appointed to represent him on post-trial motions, was permitted to withdraw. The attorney appointed to succeed

police officers. Two of the statements in question were made
at St. Joseph Hospital, five were given after the appellant had
been transferred to St. Agnes Burn Center, and two additional
statements were made several months later during an inter-
view at the police administration building.

The appellant argues that the statements at the hospital and
the burn center were involuntary on account of his physical
and mental condition at the time they were given. He points
to the testimony of a physician indicating that he was seriously
injured, suffering from second and third degree burns over
40% of his body. He focuses on testimony as to the types of
medication he received—penicillin, mycostatin, benadryl, di-
laudid, librium, and demerol—some of which, especially in
combination, can make a person drowsy. He also emphasizes
the observations of various witnesses as to his physical condi-
tion (heavily bandaged, oxygen tent, catheter, intravenous
feeding, legs in a sling) and his apparent pain. He finally
argues that as his arrest was based on these statements, the
statements made at the police administration building follow-
ing his arrest should have been suppressed.

The Commonwealth responds by noting that the standard of
review of a determination that a statement was voluntarily
given is whether the factual findings of the common pleas
court are supported by the record. *Commonwealth v. D'Am-
ato*, 514 Pa. 471, 526 A.2d 300 (1987). The Commonwealth
notes that the court made extensive findings of fact, based in
large part on the testimony of the appellant's treating physi-
cian, that the appellant was awake, alert, oriented, and cooper-
ative when interviewed by the police, and that the medication

him was later permitted to withdraw as well. His successor filed a
brief in February of 1990, and the case was submitted on the briefs on
October 22, 1990. In March of 1992, the Court entered an Order
remanding for the appointment of new counsel, noting that "the efforts
of appellant's counsel are less than adequate for the purpose of review-
ing this death penalty appeal." 529 Pa. 428, 604 A.2d 1020. Present
counsel filed his brief in October of 1993. Therein he represented that
after review he was unable to discern in what way the previously filed
brief was defective or inadequate. He therefore incorporated that brief
and the issues raised therein, along with four additional issues. In this
Opinion, we begin by addressing the issues raised in the first brief and
follow with analysis of the issues raised in the second brief.

he was given for pain did not affect his consciousness or awareness. The court did suppress one statement given after the appellant had been heavily sedated following symptoms of delirium tremens. However, this occurred after all of the other statements had been given.

Our review establishes that the record supports the factual findings of the common pleas court regarding the appellant's physical and mental condition at the time of the challenged statements. There is no basis for disturbing the court's decision to admit the statements as voluntarily given.

■ The appellant's second argument is that the court erred in refusing to suppress evidence seized at the scene of the fire without a search warrant, and in permitting Commonwealth witnesses to comment on evidence that had been suppressed. The appellant argues that the court should have suppressed photographs of the fire scene taken by fire department personnel. These photos depicted various objects (two burned chairs and an empty white plastic jug) that were later seized before the search warrant had been issued, and which the court ordered suppressed "in an overabundance of caution".

In ruling on post-trial motions, the court stated that suppression was not required under the plain view exception to the warrant requirement, citing *Commonwealth v. Smith*, 511 Pa. 36, 511 A.2d 796 (1986), cert. denied, 479 U.S. 1006, 107 S.Ct. 643, 93 L.Ed.2d 700 (1986); *Michigan v. Clifford*, 464 U.S. 287, 104 S.Ct. 641, 78 L.Ed.2d 477 (1984); and *Michigan v. Tyler*, 436 U.S. 499, 98 S.Ct. 1942, 56 L.Ed.2d 486 (1978). If suppression of the items themselves was not required, the court held, it surely was not error to admit photographs of the items or testimony about the photographs.

The photos were taken less than an hour after the fire personnel arrived at the scene and depicted items in plain view. Moreover, the "comments" complained of referred not only to the photographs but to observations made by the fire fighters in the course of their duties in extinguishing the fire and investigating its origin. Under these circumstances, there

was no error in admitting the photographs or allowing the testimony.

The appellant's third argument is that the court erred in finding that probable cause existed to support the issuance of two warrants, one authorizing the search of the premises and the other authorizing the seizure of the appellant's clothing. He argues that the affidavits supporting the warrants "fail[ ] to suggest any criminal conduct on the part of appellant."

■ We note first that the court suppressed the clothing because it had been seized prior to the issuance of the warrant. There is thus no claim of error for our review in this respect. Regarding the warrant to search the premises, the Commonwealth properly characterizes this argument as frivolous. As the court observed, "all evidence seized pursuant to the warrant and admitted into evidence was recovered from the basement or living room of the premises or from the bodies of the victims. The search of the defendant's private rooms led to the discovery of no evidence." Opinion at 33. The police were justified in obtaining a warrant to search the premises regardless of whether there was probable cause to connect the appellant to the crime.

■ Furthermore, the affidavit stated, among other things, that a police officer responding to a radio call had observed the appellant, wearing burned and charred pants, being assisted by a fire fighter at the scene; that the appellant had been transported to the hospital and found to have burns over 40% of his body; that police and fire personnel discovered the bodies of two women bound and gagged and burned to death in the basement of the premises; and that a witness had seen the appellant and two women going into the basement, and no one else present, shortly before the fire. The affidavit, viewed in a "common sense, nontechnical, ungrudging, and positive manner," *Commonwealth v. Jones,* 506 Pa. 262, 269, 484 A.2d 1383, 1387 (1984), recited facts giving rise to a reasonable belief that a crime had occurred and that the appellant was involved in the crime.

■ The appellant's next argument is that the court erred in denying a motion for mistrial following a witness's answer to a hypothetical question based on facts not of record. The prosecutor asked the Fire Battalion Chief:

Based on your examination of Commonwealth's exhibit 1E [a photograph of the basement steps], your physical examination of Commonwealth's Exhibit 3 [a pair of burned eyeglasses], and the singeing that you observed to the defendant's face, does the Commonwealth Exhibit 1E aide you in making a determination of where the Defendant was at the point of ignition, *if he was wearing glasses?*

N.T. p. 159 (emphasis added). Counsel objected and requested a mistrial, arguing that there was no evidence in the record that the appellant was wearing glasses that night. The court overruled the objection, subject to the Commonwealth's later establishing that the appellant was wearing glasses prior to the fire.

■ The Commonwealth later established through other witnesses that the appellant wore glasses every day; that he asked for his glasses from his hospital bed, complaining that he could not see without them; and that the glasses found on the steps were the kind that he constantly wore. The order in which evidence is presented is a matter committed to the trial court's discretion and its rulings will not be interfered with absent an abuse of that discretion. *Commonwealth v. Smallwood,* 497 Pa. 476, 442 A.2d 222 (1982); *Commonwealth v. Hickman,* 453 Pa. 427, 309 A.2d 564 (1973). We find no error in the court's decision to permit the Commonwealth to ask the above question of its first witness, rather than requiring that the witness be recalled after the "linking" testimony had been received.

■ We next consider the appellant's argument that the court erred in denying a request for mistrial following certain prejudicial comments by the prosecutor. Commonwealth witness Michael Williams testified that he had been sitting outside his house in view of the scene for about five minutes, gone inside to take a phone call, and then returned outside when he

heard there was a fire across the street. The Commonwealth stated, in the presence of the jury, that it intended to lay the foundation for a plea of surprise, "based on a conversation the Commonwealth had with this witness before he took the stand...." N.T. p. 2.88. Counsel objected, and the ensuing discussion occurred out of the hearing of the jury. Counsel also moved for a mistrial on the grounds that it was improper for the prosecutor to plead surprise in front of the jury. The court denied the motion, ruling that the appellant had not been prejudiced by the prosecutor's action.

The appellant argues here that by pleading surprise in the presence of the jury, the prosecutor was in effect testifying that Williams's testimony was inconsistent with a previous unsworn statement to the prosecutor. The court observed that the prosecutor's comments in the presence of the jury had no substantive content and thus could not have prejudiced the appellant. Additionally, it appears from our independent examination of the record that after the discussion in chambers, neither the substance of the prior statement (that Williams had been outside in view of the scene for an hour and had not seen anyone enter the residence where the fire occurred) nor any inconsistency, was presented to the jury. We therefore concur with the court's determination that the appellant could not have suffered any prejudice from the prosecutor's remark, much less prejudice sufficient to require a mistrial.

█ The appellant's final argument arising out of the phase of the trial conducted to establish guilt is that the court erred during the charge to the jury in expressing the opinion that voluntary manslaughter did not apply to the facts of the case. The appellant argues that it is improper for the court to invade the province of the jury by expressing an opinion as to the defendant's guilt or innocence or as to the degree of homicide that the evidence justified.

We agree with the Commonwealth that the appellant isolates the court's remarks and removes them from the context of the full instruction in which they were made. The court's

instruction on voluntary manslaughter encompassed six full pages of the transcript and conveyed the law as it existed at the time of trial, that an instruction on voluntary manslaughter must be given in every case of murder when requested by the defense, notwithstanding the absence of any evidence to support a charge of voluntary manslaughter. See *Commonwealth v. Manning*, 477 Pa. 495, 384 A.2d 1197 (1978)[2].

The appellant fails to acknowledge that the court specifically advised the jurors that they were "in no way, shape, or form bound by" his opinion, that "if you want to return that verdict, you return it. It is your power to do so, and you feel free to do so and disregard my opinion." N.T. 2.784—2.785. He also fails to note the court's more general explanation that the jury had "a time-honored right vested in you as the fact-finders ... to bring in a verdict of voluntary manslaughter even if there is no evidence at all in the record to support a verdict of guilt of such charges." *Id.* In *Commonwealth v. Milton*, 491 Pa. 614, 421 A.2d 1054 (1980), we specifically held that it was not improper for the court, in the course of giving a requested voluntary manslaughter charge, to express its opinion that there was no evidence to support such a verdict, where the court clearly stated that its opinion was not binding on the jury. See also *Commonwealth v. Scaramuzzino*, 485 Pa. 513, 403 A.2d 82 (1979); *Commonwealth v. Bennett*, 471 Pa. 419, 370 A.2d 373 (1977). The court's instruction, therefore, was not erroneous under the law prevailing at the time of trial. To the extent that it can be argued that the law has subsequently changed, this is not to the appellant's advantage and provides no grounds for relief, since any change is in the direction of not requiring the voluntary manslaughter charge at all where there is no evidence to support it.

---

2. In *Commonwealth v. Carter*, 502 Pa. 433, 466 A.2d 1328 (1983), the Court overruled *Manning*, holding that the court was not required to charge on "unreasonable belief" voluntary manslaughter where there was no evidence to support such a finding. The Court later suggested in *Commonwealth v. Frey*, 504 Pa. 428, 450 n. 10, 475 A.2d 700, 711 n. 10 (1984), that the same rationale should apply to a "heat of passion" voluntary manslaughter charge, and thus "there is little or no vitality left to this practice."

Regarding the penalty phase of his trial, the appellant states that the sentencing statute is unconstitutional on its face and as applied. However, he presents no separate argument as to unconstitutionality in application. The facial challenge to constitutionality asserts that the statute vests unrestrained discretion in the jury; provides no accurate standards for weighing the defendant's character or record, or for weighing aggravating circumstances against mitigating circumstances; and impermissibly assigns the defendant the burden of proving mitigating circumstances by a preponderance of the evidence. The Commonwealth accurately responds that our Court has previously considered and rejected these precise arguments. See, e.g., *Commonwealth v. Zettlemoyer*, 500 Pa. 16, 454 A.2d 937 (1982), cert. denied, 461 U.S. 970, 103 S.Ct. 2444, 77 L.Ed.2d 1327 (1983); *Commonwealth v. Holcomb*, 508 Pa. 425, 498 A.2d 833 (1985) (plurality), cert. denied, 475 U.S. 1150, 106 S.Ct. 1804, 90 L.Ed.2d 349 (1986); *Commonwealth v. Blystone*, 519 Pa. 450, 549 A.2d 81 (1988), aff'd, *Blystone v. Pennsylvania*, 494 U.S. 299, 110 S.Ct. 1078, 108 L.Ed.2d 255 (1990). The appellant puts forward no reason why we should revisit these issues or overrule them.

We have also previously considered and rejected the appellant's claim that it was error to allow the Commonwealth to challenge for cause all members of the venire who were conscientiously opposed to the death penalty. *Commonwealth v. Marshall*, 523 Pa. 556, 568 A.2d 590 (1989); *Commonwealth v. Edwards*, 521 Pa. 134, 555 A.2d 818 (1989); *Commonwealth v. Maxwell*, 505 Pa. 152, 477 A.2d 1309 (1984). Again, the appellant presents no new reasons in support of this argument, and there is no cause to reexamine our previous holdings.

■ The appellant also argues that the jury failed to follow the requirements of the penalty statute. After the jury had deliberated for about an hour, the judge received a note indicating that a decision had been reached but two jurors refused to sign the verdict slip. The judge instructed the jury that all twelve jurors had to sign the slip. About a half hour

later, the jury returned with a sentencing verdict slip signed by all twelve jurors.

The transcript reveals that the judge read the note as follows:

THE COURT: All right. If I make a mistake in reading it, correct me. It was sent out at 6:50, after the jurors were sent out at 5:50, after an hour of deliberations.

"After answering all the questions on aggravating and mitigating circumstances, and we find the aggravating is more than one mitigating—after answering all questions on aggravating and mitigating circumstances, *we find the mitigating is more.* Two people refused to sign. . . .

N.T. 3.95—3.96 (emphasis added). The appellant focuses on the emphasized language to argue that some of the jurors may have found that the mitigating circumstances outweighed the aggravating, and that they may have been "coerced" into signing the verdict slip even if they did not agree.

This argument is belied by the portion of the transcript that follows. Immediately after reading the note, the judge continued:

THE COURT: All right. There is an ambiguity. Do you mean you took a verbal poll and all were unanimous?

JUROR NO. 8: Yes.

THE COURT: That you found aggravating and mitigating, and the aggravating outweighed the mitigating?

JUROR NO. 8: Yes.

THE COURT: And then, when it came time to sign, two didn't?

JUROR NO. 8: Yes.

THE COURT: All right. Show the note to the attorneys.

N.T. 3.96. The judge then continued with an explanation that the legislature required all twelve jurors to sign because of the seriousness of the decision. He later indicated:

THE COURT: The fact that you will sign indicates the deliberate nature of your act and that you in fact mean and intend and are voluntarily doing what you intend to do.

But, when you took an oral poll, all 12 agreed?

JUROR NO 8: Yes.

THE COURT: The only consequence of signing is that it is required by law.

It may well be that the two who didn't sign are not sure. That is their prerogative. Okay?

If the two are not sure, they won't sign. It may necessitate further deliberations. I know not. I don't want to— you do what you in your hearts and minds want to do.

N.T. 3.98. The judge then polled the jurors individually to ensure that they understood that they were to "do in your heart and mind what you want to do." Following this, the judge again repeated the dialogue with the foreman as to the understanding of the note, that is that there was a unanimous oral vote that aggravating circumstances outweighed mitigating, and that two jurors would not sign the slip. The judge then stated:

THE COURT: That indicates one of two things: that the two who wouldn't sign are not sure, or that the two who wouldn't sign are fearful of the consequences. All right?

Now, they make their minds up today, tomorrow, whenever it may be. Now, if they really, on the oral poll, meant what they intended, they will sign. If they won't sign when I send you back, it means they are indecisive. Okay?

Signing is of no consequence other than the law requires it.

Whoever the two might be, if the two don't want to sign because they in good conscious [sic] don't find, in an intellectual sense, their finding and decision is in accordance with the other ten, then they don't sign.

N.T. 3.100. As the record fails to support the appellant's claim that some of the jurors may have been coerced into signing a verdict slip they did not agree with, the claim must be rejected.

█ In addition to the foregoing arguments, the appellant claims that he was denied his right to effective representation by counsel in three respects. First, he claims that counsel

failed to present evidence of his good character at trial, and cites to numerous cases holding that the failure to present character evidence can be deemed ineffective if there is no reasonable basis for the failure. These cases, however, do not assist the appellant in his argument, because despite a post-trial hearing on this issue, the appellant has not brought forward any character witnesses, demonstrated that they would have been available and willing to testify at the trial, established what their testimony would have been or how it would have been helpful, or attempted to show that counsel knew or should have known of their existence. Indeed, at the hearing, trial counsel offered testimony, credited by the court, that he had discussed the use of character witnesses with the appellant, but the appellant had not provided him with any.

The appellant's second claim of ineffective assistance mirrors the first in arguing that "if counsel had conducted an adequate investigation, he would have discovered many family members and friends who would have testified to his character and background" at the penalty hearing. Brief at 11. The Commonwealth responds that this is an attempt "to bootstrap the nonexistent upon the frivolous." Brief at 17. As with the claim regarding the failure to present character witnesses at trial, the appellant does not now and has never offered any specific support for the bald assertion that "many family members and friends" would have testified on his behalf. The burden of proving a claim of ineffective assistance rests on the defendant, *Commonwealth v. Williams*, 524 Pa. 218, 570 A.2d 75 (1990). Here that burden clearly has not been met.

The appellant also puts forward the argument that counsel was ineffective for failing to request an instruction on diminished capacity. He asserts that "the evidence clearly established that the appellant was an alcoholic who had been drinking at the time of the murder," and argues that "the existence of diminished capacity ... would have negated the specific intent required for a conviction of first degree murder." Brief at 14.

■ This argument has no merit. A diminished capacity defense admits liability generally but contests the degree of culpability based on the defendant's inability to possess a particular mental state. *Commonwealth v. Weinstein,* 499 Pa. 106, 451 A.2d 1344 (1982). The defense strategy at trial, however, was to deny criminal liability entirely. Although the defense put on no evidence of its own, the appellant's claim that two men had robbed him and the girls, then set the fire, was put before the jury during the Commonwealth's case by way of the appellant's statements, and defense counsel stressed the circumstantial nature of the Commonwealth's case, arguing that the Commonwealth had not proved guilt beyond a reasonable doubt.

We have previously held that counsel's strategic decision to seek acquittal rather than pursue a diminished capacity defense does not constitute ineffective assistance if there is a reasonable basis for the strategy chosen. See *Commonwealth v. Cross,* 535 Pa. 38, 634 A.2d 173 (1993); *Commonwealth v. Davenport,* 494 Pa. 532, 431 A.2d 982 (1981). Counsel's decision in this case was eminently reasonable. Moreover, it appears from the post-trial hearing that counsel explained the strategy to the appellant "from day one." And that strategy having been pursued through trial, there was no evidence on which a diminished capacity instruction would have been warranted. Although the doctor who conducted the intake examination of the appellant testified that the appellant smelled of alcohol and appeared inebriated, he also indicated that the appellant was oriented, gave appropriate answers to questions, had no difficulty in communicating, and gave his account of the robbery and fire.

■ The mere fact of intoxication does not make out a diminished capacity defense. *Commonwealth v. Tilley,* 528 Pa. 125, 595 A.2d 575 (1991). Rather, to warrant a finding that a homicide does not rise to the level of first degree murder, the evidence must demonstrate that the defendant was intoxicated to such an extent that he was unable to form the requisite intent. *Commonwealth v. Barnosky,* 436 Pa. 59, 258 A.2d 512 (1969). Stated in another way, it must be

established that the defendant was "overwhelmed to the point of losing his sensibilities," *Commonwealth v. Breakiron,* 524 Pa. 282, 296, 571 A.2d 1035 (1990). Counsel testified that in his opinion "it would have been ridiculous ... to present an intoxication defense." N.T. 9/5/84 p. 124. There is no basis in the record for questioning his judgment.

 Finally, the appellant makes a claim of prosecutorial misconduct, asserting that the Commonwealth, in violation of Pa.R.Crim.P. 305 B(1)(e), failed to disclose the results of blood alcohol tests performed on the appellant. That Rule requires the Commonwealth to "disclose to the defendant's attorney ... results of reports or scientific tests ... or other physical or mental examinations of the defendant, which are within the possession or control of the attorney for the Commonwealth."

The appellant notes that during the penalty hearing, he called a doctor to testify concerning his intoxication. In the course of the doctor's testimony, the following exchange occurred:

THE COURT: Can you give us a genuine opinion concerning the physical and mental state of Mr. Jones in and about 12:21 a.m. on July 30, 1980, on the basis of what occurred, the physical description of him in the hospital as contained in the hospital record, and knowing the amount of alcohol he drank, when he drank it, and what the effect was, and not having seen him?

A: That is a complicated question. I think that all I can do is, I can say that, from the information provided to me, that Mr. Jones was in fact inebriated, he was intoxicated. From the information provided to me, he in fact was at the limit of legal intoxication in the State, and that people who are intoxicated behave in certain ways and can behave in certain ways, and I can only speak in general terms about the effects of alcohol. I can't specifically state that these effects were present with Mr. Jones.

Q: Why not?

A: I didn't see him at the time.

Q: Do you know how much he had drunk?

A: I believe I was informed that his blood alcohol level was—

Q: Wait a minute. There is no evidence of blood alcohol level anywhere in the record.

A: I was informed that there was.

Q: Well, there isn't

[DEFENSE COUNSEL]: You weren't informed from me, were you?

A: No: The District Attorney.

THE COURT: All right.

THE WITNESS: The District Attorney said to me that—

THE COURT: All right. Wait a minute. Just leave it go at that. Stop.

N.T. 3.52.

The appellant asserts that this exchange "established" that the doctor "had information concerning the blood alcohol level of the appellant that was provided by the Assistant District Attorney." Brief at 16.

The Commonwealth responds that there is no evidence in the appellant's hospital record of any blood alcohol test having been performed on the appellant, nor, under the circumstances, would there have been any reason for one. Based on the appellant's statement at the time, he was being treated for burns as a robbery and fire victim. Furthermore, the Commonwealth had no opportunity to perform or direct the performance of such a test on its own. Finally, it would make no sense for the Commonwealth to conceal the results of the test from the appellant while at the same time disclosing it to the appellant's witness.

It is too great an extrapolation from the witness's comment that he believed he was informed of the appellant's blood alcohol level by the district attorney to the conclusion that the Commonwealth in fact had the results of such a test and withheld them. We note that at a later point in his testimony on cross-examination, the same witness indicated that a doctor at the hospital had informed him what the alcohol level was,

see N.T. 3.59. Our review of the record discloses that this argument is founded on nothing more than fanciful conjecture. There is no basis in the record for a finding of prosecutorial misconduct.

Having rejected all claims of error raised on behalf of the appellant, we have examined the record as is our duty under 42 Pa.C.S. § 9711(h)(3). The jury unanimously found three aggravating circumstances as to each verdict of first degree murder: that the defendant had killed the victim during the commission of another felony (arson); that he knowingly created a grave risk of death to others; and that the killing occurred by means of torture. 42 Pa.C.S. § 9711(d)(6), (7), and (8). The jury also found that these aggravating circumstances outweighed the one mitigating circumstance, that the defendant had no substantial history of prior criminal convictions. 42 Pa.C.S. § 9711(e)(1).

Our review leads us to the conclusion that the finding as to each aggravating circumstance is supported by the record. We note particularly with respect to the finding of torture that the Commonwealth proved more than that the victims burned in an arson fire. The Deputy Medical Examiner testified that the victims had been tightly bound with an electrical cord wrapped around their necks and tied to a stair post. Their clothes had been saturated with gasoline. He further determined, based on the presence of smoke in the victims' lungs, that they were alive at the time they were set on fire. The positions of their bodies indicated that they had struggled to the extent of pulling the stair post off of its mount and writhed in pain before dying.

Further, there is nothing in the record to suggest that the sentence was the product of passion, prejudice, or other arbitrary factor. Finally, upon comparison of this case with similar cases, using the information compiled by the Administrative Office of Pennsylvania Courts, see *Commonwealth v. Frey*, 504 Pa. 428, 475 A.2d 700 (1984) cert. denied 469 U.S. 963, 105 S.Ct. 360, 83 L.Ed.2d 296 (1984), we cannot conclude

that the sentence is either excessive or disproportionate. The judgment of sentence of death must, therefore, be affirmed.

The Prothonotary of the Supreme Court is directed to transmit, as soon as possible, the full and complete record of the trial, sentencing hearing, imposition of sentence, and review by the Court, to the Governor. 42 Pa.C.S. § 9711(i).

MONTEMURO, J., is sitting by designation.