J-S43013-19

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| Appellee | : | |
| | : | |
| v. | : | |
| | : | |
| BRANDON JALON MAZE | : | |
| | : | |
| Appellant | : | No. 183 MDA 2019 |

Appeal from the Judgment of Sentence Entered October 24, 2018
In the Court of Common Pleas of Franklin County
Criminal Division at No(s):  CP-28-CR-0000342-2017

BEFORE:   GANTMAN, P.J.E., DUBOW, J., and STEVENS*, P.J.E.

MEMORANDUM BY GANTMAN, P.J.E.:          **FILED NOVEMBER 07, 2019**

Appellant, Brandon Jalon Maze, appeals from the judgment of sentence entered in the Franklin County Court of Common Pleas, following his jury trial convictions for aggravated assault and conspiracy to commit first-degree murder.[1]  We affirm.

In its opinion, the trial court accurately set forth the relevant facts and procedural history of this case.  Therefore, we have no reason to restate them.

Appellant raises the following issues for our review:

> DID THE COMMONWEALTH INTRODUCE SUFFICIENT EVIDENCE TO CONVICT [APPELLANT] OF AGGRAVATED ASSAULT AND CRIMINAL CONSPIRACY TO COMMIT FIRST DEGREE MURDER?
>
> WERE THE JURY VERDICTS OF GUILTY TO COUNT 1 AGGRAVATED ASSAULT AND COUNT 3 CRIMINAL

---

[1] 18 Pa.C.S.A. §§ 2702(a)(1); 903 (2502(a) related), respectively.

---

\* Former Justice specially assigned to the Superior Court.

CONSPIRACY TO COMMIT FIRST DEGREE MURDER AGAINST THE WEIGHT OF THE EVIDENCE SUCH THAT IT SHOCKS THE CONSCIENCE?

DID THE TRIAL COURT ABUSE ITS DISCRETION BY FAILING TO SUFFICIENTLY COLLOQUY THE JUROR WHO IS BELIEVED TO HAVE FALLEN ASLEEP DURING THE PROCEEDINGS OUTSIDE THE PRESENCE OF OTHER JURORS OR [QUESTION] THE OTHER JURORS REGARDING THE "SLEEPING JUROR" TO DETERMINE WHETHER A MISTRIAL SHOULD BE DECLARED?

DID THE TRIAL COURT ABUSE ITS DISCRETION BY ADMITTING HEARSAY OF THE ALLEGED VICTIM…UNDER THE EXCITED UTTERANCE STANDARD WHEN HE HAD SUFFICIENT TIME AND AFORETHOUGHT TO LIE TO THE POLICE REGARDING HIS OWN IDENTITY?

WAS [APPELLANT'S] RIGHT TO CONFRONT HIS ACCUSER…VIOLATED BY THE ADMISSION OF THE ALLEGED VICTIM'S STATEMENTS TO POLICE WITHOUT [VICTIM'S] TESTIMONY AT TRIAL?

(Appellant's Brief at 10-11).

After a thorough review of the record, the briefs of the parties, the applicable law, and the well-reasoned opinion of the Honorable Jeremiah D. Zook, we conclude Appellant's issues merit no relief. The trial court opinion accurately discusses and properly disposes of the questions presented. (*See* Trial Court Opinion, filed March 15, 2019, at 12-20; 22-36) (finding: **(1)** (at 24-32) Joseph King testified that Appellant's co-defendant, Anthony Cobb, directed him and others to search for "Black," who was responsible for stabbing Mr. Cobb; after locating person he believed to be Black, Mr. King notified Mr. Cobb and met up with Mr. Cobb, Ryan Troskoski, and Appellant; Appellant and Mr. King began to look for Black and stopped a hooded male

(Victim); Appellant aggressively went after Victim, who Appellant thought was Black, and Victim ran; Appellant raised his right arm and fired shots at Victim; this evidence was sufficient to sustain Appellant's aggravated assault conviction; further, both Mr. King and Mr. Troskoski testified they met up with Appellant and Mr. Cobb under mutual understanding that they were going to search for and kill person responsible for stabbing Mr. Cobb; Commonwealth presented sufficient evidence to sustain Appellant's conspiracy conviction; **(2)** (at 32-35) Appellant's focus on height of bullet holes in surrounding buildings as alleged evidence of Appellant's lack of intent would require jury (and this court on weight claim) to ignore significant evidence of contrary intent; evidence showed goal shared by Appellant, Mr. King, Mr. Troskoski, and Mr. Cobb, was to hunt down person responsible for stabbing Mr. Cobb; evidence presented significantly outweighed any argument concerning height of bullet holes or fact that Victim was not actually injured; verdicts did not shock court's conscience; **(3)** (at 22-24) on first day of trial, court observed Juror #4 having trouble paying attention; court asked juror if he was having trouble staying awake and juror responded "no"; court asked if juror wanted to take break to get cup of coffee or stretch legs; court stressed importance of paying attention and asked if juror was sure he was awake; juror said he did not need coffee or break and was sure he was awake; to extent Appellant complains court did not colloquy juror, record belies that contention; to extent Appellant claims colloquy was insufficient, Appellant did not object at that time and did not ask

court to remove juror or move for mistrial, so issue is waived; moreover, juror responded convincingly that he was okay to proceed; **(4)** (at 12-20) Victim did not testify, so Commonwealth called Officer Sanders to testify concerning statements Victim made to him; Officer Sanders had responded to scene of shooting, where officer noted Victim was very emotional, upset, and was breathing heavily; Officer Sanders had trouble getting information from Victim due to Victim's emotional state; Officer Sanders' discussion with Victim occurred within minutes of shooting; Appellant objected on hearsay grounds to Officer Sanders' testimony about his discussion with Victim; court permitted Officer Sanders' testimony under excited utterance hearsay exception; circumstantial evidence established shooting had occurred; two of Appellant's cohorts also testified for Commonwealth and detailed Appellant's involvement in shooting; record contains no evidence that Victim spoke to others about shooting before Victim discussed shooting with Officer Sanders; **(5)** (at 35-36) Appellant objected to Officer Sanders' testimony regarding Victim's statements solely on hearsay grounds, so alleged Confrontation Clause violation claim is waived). Accordingly, we affirm on the basis of the trial court's opinion.

Judgment of sentence affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: 11/7/2019

# IN THE COURT OF COMMON PLEAS OF THE 39TH JUDICIAL DISTRICT OF PENNSYLVANIA – FRANKLIN COUNTY

| | | |
|---|---|---|
| **COMMONWEALTH OF PENNSYLVANIA** | : | CRIMINAL ACTION |
| | : | |
| | : | CP-28-CR-0000342-2017 |
| V. | : | |
| | : | **JUDGE JEREMIAH D. ZOOK** |
| | : | |
| **BRANDON JALON MAZE,** | : | |
| | : | |
| DEFENDANT | : | |

## OPINION SUR. PA.R.A.P. 1925(a)

### I. FACTUAL BACKGROUND

On April 20, 2016, a melee occurred near the Waynesboro Police Department, in the Borough of Waynesboro, Franklin County. A number of individuals were involved, and the incident was chaotic. The Defendant's co-defendant, Anthony Cobb (AKA: Ant), was present and involved in the melee.

During the melee, an individual known as "Black" approached Cobb and stabbed/slashed him with a knife. Cobb responded by pulling out a firearm, chasing Black, and firing a shot at him.

Corporal Stewart Hannah of the Waynesboro Police Department was at the time of this incident transporting a juvenile in an unrelated matter. While he was walking with the juvenile,

Filed **MAR 15 2019**

_Barbara E. Black_
Clerk  Dep  /!/

Cpl. Hannah heard an emergency dispatch regarding the fight near the police department. Cpl. Hannah returned the juvenile to the department, and then proceeded towards the location of the melee.

An African-American male approached Cpl. Hannah and advised he had been shot. The man was identified as Jermain Jenkins. Cpl. Hannah quickly checked Jenkins for injury, and finding none, directed him to remain at the rear of the police station. Cpl. Hannah proceeded on to the location of the melee a few doors down from the station.

Cpl. Hannah began to question individuals at the scene, and also located a spent shell casing in the area. The shell was from a 9mm gun. Police subsequently located a bullet hole in a nearby residence. They also located a sheath for a knife in a nearby alley.

That same evening, Joseph King, an associate of Cobb and the Defendant, heard that Cobb had been the victim of an attempted robbery. King knew Cobb to have the street name "Ant." King made contact with Cobb. Cobb relayed that somebody had tried to rob him and stabbed him. Cobb advised King that Cobb pulled a gun and fired a shot after being stabbed.

2

Cobb directed King to look for the people responsible for his stabbing. Cobb was angry and upset about the situation, and if King located the individual known as "Black," he was to notify Cobb. King then began to search for the "Black."

That same evening, King spotted a couple of individuals in the area of the Rotary parking lot, off of Potomac Street in the Borough. He approached them and had some minimal contact with them. At that point, King believed these were the individuals responsible for stabbing/robbing Cobb. He notified Cobb by phone.

A few minutes later, Cobb arrived at the Rotary parking lot in a vehicle driven by Ryan Troskoski. Cobb was in the front passenger seat and the Defendant was in the rear seat. King entered the vehicle and Cobb handed him a 9mm gun. King understood at that time to use the gun to go after the people responsible for Cobb's stabbing.

Troskoski drove them to another location nearby; King and the Defendant exited the vehicle. They entered an alley near the Rutter's gas station and observed an individual, later identified as Corey Ballard, wearing a hood. The Defendant aggresively called for Ballard to come over to him; Ballard immediately fled the area. The

3

Defendant gave chase. Ballard hopped over a fence and King saw the Defendant raise his right arm and saw a flash from the muzzle of a firing gun. King turned to run away and heard several more gun shots. King fled the area; the Defendant caught up with King shortly. They did not exchange many words, parting ways shortly thereafter.

King made contact with Cobb at a later time; at that point he learned that the Defendant had shot at the wrong person, *i.e.*, mistaken identity. King returned the firearm to Cobb. King also had subsequent contact with the Defendant. The Defendant was angry with King that he had not fired his gun at Ballard.

Troskoski, for his part, lived with Cobb on April 20, 2016. On that date, he spoke with Cobb and observed Cobb's injury from the stabbing. Cobb related to him that he had fired his gun at the man who stabbed him. When Cobb learned from King that "Black" was near Rutter's that evening, he directed Troskoski to go to the storage unit and retrieve a duffel bag containing handguns.

Troskoski took the handguns to the Rotary parking lot. King, Cobb, and the Defendant all met Troskoski at the parking lot. Cobb gave a gun to King and a gun to the Defendant. Everyone

4

understood this to mean they were going to shoot the person responsible for stabbing Cobb. They drove to an alley near Rutter's and King and the Defendant exited the vehicle. Cobb directed Troskoski to drive back past Rutters and pull off. As he was doing this, Troskisi heard five gunshots.

Cobb directed Troskoski back to the area where King and the Defendant had exited the vehicle. They made contact with the Defendant in that area; the Defendant was upset that King had not fired his gun. The Defendant confirmed to Troskoski that the gunshots he heard were from the Defendant.

At some point later in the investigation, Cobb was interviewed by the Waynesboro Police. Cobb admitted to being involved in the melee near the police station, and to being stabbed. However, he denied possessing or firing a gun. Cobb did admit that, if he had a gun when he was stabbed, he would have ran down the person responsible and killed them.

Shortly after the Defendant shot at Ballard, the police made contact with Ballard at the Rutter's store. Ballard was emotional and upset to the point he could hardly explain to the police what had just occurred. Officer Steven Sanders spoke with Ballard and

5

then began an investigation of the scene. During his investigation the following morning,[1] several bullet holes/impacts were observed in the surrounding buildings/infrastructure.

On April 25, 2016, Officer Sanders was flagged-down while on patrol by Diane Hamilton, a resident in the area of the shooting involving the Defendant and Ballard. She had heard the gunshots on the night in question. She showed Officer Sanders some clothing that she had discovered in her trashcan. This clothing was taken into evidence. Subsequent DNA testing of the clothing revealed a match to a known sample of DNA taken from the Defendant.

After charges were filed against Cobb, King, Troskoski, and the Defendant, Cobb wrote several letters to individuals associated with his co-defendants. These letters revealed incriminating evidence against Cobb

## II. PROCEDURAL HISTORY

On August 1, 2016, the Waynesboro Police Department filed a *Police Criminal Complaint* charging the Defendant with Attempted

---

[1] At the time of the shooting, it was dark. The police returned to the area the following morning to conduct a more extensive investigation of the scene.

Murder of the Third Degree,[2] Persons Not to Possess Firearms,[3] Solicitation to Commit Murder of the Third Degree,[4] and Conspiracy to Commit Murder of the Third Degree.[5] An arrest warrant was issued for the Defendant's apprehension.

On October 28, 2016, the Defendant was brought before the Magisterial District Judge; the MDJ denied bail and committed the Defendant to the Franklin County Jail to await further proceedings. After a number of continuances, a preliminary hearing was held on February 14, 2017; all charges were bound over to this court for trial. Prior to the preliminary hearing, the Commonwealth filed a *Notice of Joinder*, joining this matter with the charges against the co-defendants Anthony Michael Cobb and Joseph Lee King for one trial.

On March 22, 2017, the Commonwealth filed a three-count *Information* charging the Defendant with: 1) Criminal Attempt – Murder of the First Degree[6]; 2) Possession of Firearm Prohibited[7];

---

[2] 18 Pa.C.S. § 901(a) ; 18 Pa.C.S. § 2502(c)
[3] 18 Pa.C.S. § 6105(a)(1)
[4] 18 Pa.C.S. § 902(a); 18 Pa.C.S. § 2502(c)
[5] 18 Pa.C.S. 903; 18 Pa.C.S. § 2502(c)
[6] 18 Pa.C.S. § 901(a); 18 Pa.C.S. § 2502(a)
[7] 18 Pa.C.S. § 6105(a)(1)

7

and 3) Conspiracy – Murder of the First Degree.[8] That same date, the Defendant entered pleas of not guilty.

After a number of pre-trial hearings not relevant to this appeal, this matter came before the court for a pretrial conference on September 29, 2017. At that time, the Defendant was granted leave to file a motion seeking severance of this case from the co-defendants. *See Order of Court*, September 29, 2017. On October 17, 2017, the Defendant requested an extension of time to file the severance motion; the Court granted an additional thirty days. *See Order of Court*, October 19, 2017. The Defendant filed his *Motion for Severance* on November 20, 2017. A hearing was ultimately held on the Defendant's severance motion on February 23, 2018. At the conclusion of the hearing and argument, the Court denied the Defendant's *Motion for Severance*. *See Order of Court*, February 23, 2018.[9] At that time, the Defendant also elected to proceed without counsel. *See Waiver of Counsel*, February 23, 2018; *see also Order of Court*, February 23, 2018.

---

[8] 18 Pa.C.S. § 903; 18 Pa.C.S. § 2502(a)
[9] The Court granted the Defendant's oral request to sever Count 2 – Possession of a Firearm Prohibited for a separate trial. That count remains pending in this Court.

8

On April 16, 2018, the Defendant filed a second *Motion for Severance*, re-raising his request to be tried separately from his co-defendants. This court denied the motion on April 26, 2018. *See Order*, April 26, 2018.

The joint jury trial commenced against Cobb and the Defendant[10] on June 19, 2018, and concluded on June 22, 2018. The jury returned verdicts of guilt as to Count 1 – Aggravated Assault[11] (lesser included of Attempted Murder) and Count 3 – Conspiracy – First Degree Murder. *See Verdict Slip*, June 22, 2018. The court set sentencing for July 25, 2018. *See Order of Court*, June 22, 2018.

On July 2, 2018, the Defendant filed a *Motion to Request Counsel*. The court granted the Defendant's request and appointed counsel. *See Order*, July 9, 2018.

After a number of continuances, sentencing ultimately occurred on October 24, 2018. The court imposed an aggregate sentence of not less than 210 months (17 ½ years) to not more than 480 months (40 years). The Defendant filed a timely post-sentence

---

[10] Co-defendant Joseph King was not tried with Cobb and the Defendant; he had, by this point, elected to testify for the Commonwealth.
[11] 18 Pa.C.S. 2702(a)(1)

motion on November 5, 2018. On January 2, 2019, the court denied the Defendant post-sentence relief. *See Order*, January 2, 2019.

The instant *Notice of Appeal* was filed January 31, 2019. The same day, this court directed the Defendant to file a concise statement of errors claimed on appeal within twenty-one days. See Order, January 31, 2019. The Defendant timely complied. *See Concise Statement of Matters Complained of on Appeal (Concise Statement)*, February 21, 2019.

### III. ISSUES ON APPEAL

The Defendant's first claim on appeal is:

> The Honorable Trial Court abused its discretion by denying [Defendant's] request for severance of his trial from co-defendant Anthony Cobb's non-related case at [CP-28-CR-0000950-2016].

*Concise Statement,* ¶6(a).

We note that the Defendant made two separate requests for severance. The first was a counseled *Motion for Severance,* filed November 20, 2017. The court held a hearing on the counseled motion on February 23, 2018. At the conclusion of the hearing, the court denied the counseled *Motion for Severance. See Order of*

10

*Court*, February 23, 2018. This court did not explain our decision in that order. *Id.*

The Defendant filed a *pro se Motion for Severance* on April 16, 2018. The court denied the *pro se Motion for Severance* without a hearing on April 26, 2018. *See Order*, April 26, 2018.

We are unable to offer a statement as to our reasons for denial of severance for several reasons. First, and foremost, the Defendant has not caused the transcript of the hearing on February 23, 2018, to be prepared, lodged, and filed. The Defendant's *Notice of Appeal* does not contain a request for transcript or statement that the required transcript has been prepared, as required by Pa.R.A.P. 904(c). This court also directed the Defendant to make any necessary transcript request utilizing the appropriate transcript request form with court administration. *See Order*, January 31, 2019; *see also* Pa.R.A.P. 1911(a). It was the Defendant's responsibility to ensure the necessary materials are in the record for the appellate court to review this issue. *See, e.g.*, *Commonwealth v. Bongiorno*, 905 A.2d 998, 1000 (Pa.Super. 2006) ("Our law is unequivocal that the responsibility rests upon the appellant to ensure that the record certified on appeal is complete

11

in the sense that it contains all of the materials necessary for the reviewing court to perform its duty."), *citing Commonwealth v. Kleinicke*, 895 A.2d 562 575 (Pa.Super. 2006) (*en banc*).

Second, the court cannot discern from the *Concise Statement* which denial of severance (or both) is being challenged in this appeal. Pa.R.A.P. 1925(b)(4) requires a concise statement "identify each ruling or error that the appellant intends to challenge ***with sufficient detail to identify all pertinent issues for the judge.*"* Pa.R.A.P. 1925(b)(4)(ii) (emphasis added). This court cannot guess whether the Defendant challenges the court's February 23, 2018, denial of severance, the April 26, 2018, denial of severance, or both.

The Defendant's second issue in this appeal is:

> The Honorable Trial Court abused its discretion by allowing hearsay statements of Corey Ballard to be introduced as an excited utterance.

*Concise Statement,* ¶ 6(b). The testimony at issue[12] was introduced by the Commonwealth during the second day of trial. *See Transcript of Proceedings – Jury Trial*, June 20, 2018 (*Tr.2*), p. 5 – 9.

---

[12] We note here that none of the Defendant's claims of trial error listed in his *Concise Statement* include citation to the trial transcript, even though the trial transcripts were filed of record on September 4, 2018. The court has attempted, with some difficulty, to comb the lengthy transcripts of trial testimony to locate the places where the various alleged errors occurred. We

12

The Commonwealth called Officer Steven Sanders from the Waynesboro Police Department to testify. *See Tr.2*, p. 3. Early in Officer Sander's testimony, the Commonwealth attempted to question Officer Sanders concerning statements made to him by Corey Ballard, the alleged victim of the attempted murder. Mr. Ballard did not testify during the trial.

Prior to the objection at issue, Officer Sanders testified that he was employed as a police officer in the Borough of Waynesboro since 2004. *Tr.2*, p. 4. On the evening of April 20, 2016, Officer Sanders was on duty. *Id.* He was dispatched to the area of 135 South Potomac Street in the Borough for a report of shots fired. *Id.* Dispatch advised Officer Sanders that the victim of the shooting was at the Rutter's store at 141 South Potomac Street. *Tr.2*, p. 5. Upon making contact with the victim, Officer Sanders identified him as Corey Ballard. *Tr.2*, p. 5. Officer Sanders described Ballard's mental state as:

> He was very emotional. He was upset, heavy breathing. It was hard to get information out of him.

---

presume to have located the correct testimony, but cannot be sure because of the lack of citation to the record by the Defendant.

13

*Tr.2*, p. 5. These statements were made within "a couple of minutes" of the shooting. *Tr.2*, p. 6.

At this point, the Commonwealth asked Officer Sanders to relate to the jury Ballard's statements about what occurred, *i.e.*, about the shooting. *See Tr.2*, pp. 5 – 6. The Defendant objected on hearsay grounds. *See Tr.2*, p. 5, 6. The Commonwealth responded that the statements were an exception to the prohibition against hearsay as they constituted excited utterances under Pa.R.E. 803(2). The Court overruled the Defendant's objection. See *Tr.2*, p. 5, 6.

Pa.R.E. 802 provides:

> Hearsay is not admissible except as provided
> by these rules, by other rules prescribed by the
> Pennsylvania Supreme Court, or by statute.

Pa.R.E. 803 sets forth a number of exceptions to this general prohibition; relevant here is Pa.R.E. 803(2), which permits admission of:

> A statement relating to a startling event or
> condition, made while the declarant was under
> the stress of excitement it caused.

The availability of the declarant to testify at trial is immaterial to the admissibility of an excited utterance. *See* Pa.R.E. 803. Further:

14

As is well-settled, excited utterances fall under the common law concept of *res gestae*. *Res gestae* statements, such as excited utterances, present sense impressions, and expressions of present bodily conditions are normally excepted out of the hearsay rule, because the reliability of such statements are established by the statement being made contemporaneous with a provoking event. While the excited utterance exception has been codified as part of our rules of evidence since 1998, see Pa.R.E. 803(2), the common law definition of an excited utterance remains applicable, and has been often cited by this Court:

> [A] spontaneous declaration by a person whose mind has been suddenly made subject to an overpowering emotion caused by some unexpected and shocking occurrence, which that person has just participated in or closely witnessed, and made in reference to some phase of that occurrence both in time and place as to exclude the likelihood of its having emanated in whole or in part from his relflective faculties...Thus it must be show first, that [the declarant] had witnessed an event sufficiently startling and so close in point of time as to render her reflective thought processes inoperable and, second, that her declarations were a spontaneous reaction to that startling event.

15

> *Commonwealth v. Sherwood*, 603 Pa. 92, 982 A.2d 483, 495-96 (2009) (quoting *Commonwealth v. Stokes*, 532 Pa. 242, 615 A.2d 704, 712 (1992)). The circumstances surrounding the statements may be sufficient to establish the existence of a sufficiently startling event.

*Commonwealth v. Murray*, 83 A.3d 137, 157 – 58 (Pa. 2013) (some internal citations omitted).

In evaluating whether a statement falls within this well-recognized exception to the hearsay rule, courts are to consider a number of factors: 1) whether the declarant did, in fact, witness the startling event; 2) the amount time that passed between the event and the declaration; 3) whether the statement was in narrative form (which is inadmissible); and 4) whether the declarant spoke to others before making the statement, or had the opportunity to do so. *Commonwealth v. Keys*, 814 A.2d 1256, 1258 (Pa.Super. 2003). These factors are to be considered in the light of the totality of the circumstances, with the critical question being whether, at the time the statement is made, "the nervous excitement continues to dominate while the reflective processes remain in abeyance." *Id.* (quoting *Commonwealth v. Carmody*, 799 A.2d 143, 147 (Pa.Super. 2002)(additional citation omitted)).

16

Turning to the statement at issue, this court remains convinced that it was an excited utterance admissible under Pa.R.E. 803(2). First, and most potently, the statement was made while the declarant was visibly excited and within minutes of the shooting in question. As Officer Sanders described, the victim had difficulty relating what occurred to the officer due to his extreme emotional and physical state.

The circumstantial evidence subsequently produced by the Commonwealth establishes that the event in question, *i.e.*, a shooting, actually occurred. The day after this incident, Officer Sanders observed what appeared to be "bullet holes" in the side of a church at or near where the victim said he was shot at. *See Tr.2,* pp. 10 – 14. A live round of handgun ammunition was found in the area and collected as evidence. *See Tr.2,* pp. 25 – 26. Several empty shell casings were found and collected in the area of the incident. *See Tr.2,* p. 28, pp. 32 – 33. Police observed and photographed what appeared to be a bullet hole and bullet fragment in a fence in the area of the shooting. *See Tr.2,* pp. 30 – 31.

In addition, a cooperating co-defendant, Joseph King, testified for the Commonwealth. *See Tr.2,* pp. 41 – 90. King testified that he

17

was with the Defendant at the time of the shooting. *See Tr.2*, p. 49. The Defendant exchanged words with the victim, who began to run from the scene. *Tr.2*, p. 50. King testified:

> [The Defendant] chased after [the victim]. I remember seeing the kid hop a fence to get through to another alley that took him out on to Potomac, and then the next thing I knew I saw [the Defendant] raise his right arm and I saw like one muzzle flash and at that point I had turned around and started to try to run away and heard a couple more shots after I saw the initial muzzle flash from the end of his extended arm.

*Tr.2*, p. 50.

Another cooperating co-defendant, Ryan Troskoski, testified for the Commonwealth. *See Tr.2*, pp. 91 - 129. Mr. Troskoski detailed his involvement with the Defendant and the other co-defendants during the night of the shooting. Specifically, he testified to being in the area of the shooting at the time it happened. *See Tr.2*, p. 100. After the Defendant and King had left the vehicle, Troskoski heard "five gunshots go off." *Tr.2*, p. 100. Troskoski then picked up the Defendant in the area of Rutters. *Tr.2*, p. 101. The Defendant told Troskoski that the gunshots were from him shooting. *Tr.2*, p. 102.

18

Diane Hamilton, the individual residing in the area of the shooting and discovered the Defendant's clothing in her trash, testified that she heard the gunshots. *See Tr.3*, p. 4. It is clear that, although the proof was out of order,[13] the Commonwealth established that the exciting event did, in fact, occur.

The statements admitted into evidence were not in the form of a narrative, such as given by a witness in a formal interrogation setting. They were clearly given to Officer Sanders at or near the scene of the shooting; indeed, Officer Sanders testified he had trouble getting information out of Ballard due to his mental/emotional state.

Finally, we acknowledge that the record is devoid of any evidence regarding Ballard speaking with others about the shooting prior to making his utterances to Officer Sanders. Even assuming he did speak with others (for example, employees at the Rutter's), he remained in a high emotional state at the time he spoke with Officer Sanders. Under the totality of these circumstances, with

---

[13] This Court was well aware from pretrial proceedings that the Commonwealth had significant evidence that the shooting had, in fact, occurred. The order of proof to establish the elements necessary to satisfy admission of evidence is within the discretion of the trial court. *See, e.g., Commonwealth v. Jones*, 651 A.2d 1101, 1106 (Pa. 1994) ("The order in which evidence is presented is a matter committed to the trial court's discretion and its rulings will not be interfered with absent an abuse of that discretion."), additional citations omitted.

19

particular emphasis on Officer Sanders' observations of Ballard's emotional state, this court remains convinced that the statements were properly admitted under Pa.R.E. 803(2) as excited utterances.

The Defendant's third issue in this appeal is:

> The Honorable Trial Court abused its discretion by limiting [Defendant's] questioning of Officer Chappell about Commonwealth's Exhibits 25 – 30 written by co-defendant Anthony Cobb, as only select portions of those letters were provided to the jury.

*Concise Statement*, ¶ 6(c).

This claim of error relates to a discussion held between counsel, the Defendant, and the court during the third day of trial, first at sidebar, then in open court after the jury had been excused. *See Tr.3*, pp. 31 – 65. It is unclear to this court, at this time, what the error is that the Defendant is claiming the court committed. From our review of the transcript, the Defendant was granted permission to introduce unread language from a letter written by Cobb to the jury. *See Tr.3*, p. 62. After additional discussion, the following exchange occurred:

THE COURT:       Isn't that what we're going to be getting from the testimony that [Counsel for Cobb] is going to elicit that Mr. Cobb was charged federally and that it was a drug offense. Wouldn't that

20

enable you then to make that argument in your closing to the jury?

DEFENDANT MAZE: **It does, Your Honor**. It doesn't show the jury that Cobb had the intentions of setting me up though and we're just sitting here—

THE COURT: No, but I've indicated that you're permitted to read that—or have that language read from Exhibit 29 that we've already discussed here. My father always told me sometimes you rather walk a thousand miles with a friend than around the corner with family member.[14] Fuck B.[15] That's the language you want—or you've indicated that you want to make your argument to the jury that the Defendant Cobb was trying to set you up.

DEFENDANT MAZE: **I'm fine, Your Honor**.

*Tr.3*, pp. 63 – 64 (emphasis added).

In considering this claim of error, this court cannot discern precisely what limits were placed on the Defendant's cross-examination of Officer Chappell that the Defendant disagreed with. After significant discussion outside the presence of the jury, the Defendant was permitted to introduce an unread portion of the letter in question, and also agreed on the record that he was satisfied with this court's resolution of the matter. *Id.* If the Defendant is claiming error related to some other unread portion of

---

[14] Quoting from Commonwealth's Exhibit 29.
[15] Quoting from Commonwealth's Exhibit 29.

21

Commonwealth's Exhibits 25 – 29, we cannot speak to that because of the lack of specificity in his claim of error.

The Defendant's fourth claim of error is:

> The Honorable Trial Court abused its discretion by colloquy [sic] Juror Number 4 to determine whether there was good cause for removal based upon significant evidence that Juror Number 4 may be [sic] slept during portions of the trial.

*Concise Statement*, ¶ 6(d). This claim relates the first day of trial, and occurred during the direct examination of Corporal Stewart Hannah from the Waynesboro Police Department. During Cpl. Hannah's testimony related to photographs of bullet holes, the court observed Juror Number 4 having trouble paying attention. *See Tr.1*, p. 104. The following occurred on the record:

| THE COURT: | Juror No. 4, are you having trouble staying awake? |
|---|---|
| JUROR NO. 4: | No, sir. |
| THE COURT: | Your eyes are getting a little droopy there. I see your head start to go down. Would you like a cup of coffee? |
| JUROR NO. 4: | No thank you. |

THE COURT: Are you sure you're awake?

JUROR NO. 4: Yes.

THE COURT: The reason I say that is if a juror falls asleep the trial is over and we start all over with a new jury. I don't want to have to do that, so if you're having trouble staying awake please let me know. We'll get you a cup of coffee. We'll stand up, stretch your legs or whatever but don't hesitate to let me know if you're having trouble. I understand what it is like after lunch. I know exactly what it is like after lunch, so please don't hesitate to let us know if you need to stretch your legs.

Go ahead, Mr. Faust.

*Tr.1*, p. 104.

From the Defendant's claim of error, it is not clear whether he complains that the court did, or did not, colloquy Juror Number 4. To the extent the Defendant claims this court did not colloquy Juror Number 4, the record belies that assertion. To the extent the Defendant complains that the colloquy was insufficient in some

23

manner, we cannot give further statement because the Defendant did not object or otherwise make a request for further colloquy. The record is devoid of any such request at the time of the court's interaction with Juror Number 4. The Defendant did not make a motion to remove the juror or for a mistrial. Finally, the Defendant did not include this claim in his post-sentence motion. *See Post-Sentence Motion,* filed November 5, 2018. We believe this issue is waived[16] for purposes of appeal; however, it is for the Honorable Superior Court to make that determination.

To the extent this issue is properly preserved, we note that we had no reason to doubt Juror Number 4's assertion to the court that he had been awake. While our initial observation caused us some concern, the juror responded convincingly; without objection from the parties the trial continued and no party raised any concern with this juror's continued service.

The Defendant's next claim of error is:

> Did the Commonwealth present sufficient
> evidence to sustain the verdict on the

---

[16] *See* Pa.R.A.P. 302(a) ("Issues not raised in the lower court are waived and cannot be raised for the first time on appeal."). *See also, e.g., Commonwealth v. Melendez-Rodriguez,* 856 A.2d 1278, 1287 (Pa.Super. 2004) ("Nevertheless, it is well established that absent a contemporaneous objection the issue is not properly preserved on appeal."), additional citations omitted.

24

Aggravated Assault and Conspiracy to Commit First Degree Murder charges?

*Concise Statement*, ¶ 7. A challenge to the sufficiency of the evidence in support of a conviction implicates well-settled and well-trod principles:

> As a general matter, our standard of review of sufficiency claims requires that we evaluate the record in the light most favorable to the verdict winner giving the prosecution the benefit of all reasonable inferences to be drawn from the evidence. Evidence will be deemed sufficient to support the verdict when it establishes each material element of the crime charged and the commission thereof by the accused, beyond a reasonable doubt. Nevertheless, the Commonwealth need not establish guilt to a mathematical certainty. Any doubt about the defendant's guilt is to be resolved by the fact finder unless the evidence is so weak and inconclusive that, as a matter of law, no probability of fact can be drawn from the combined circumstances.
>
> The Commonwealth may sustain its burden by means of wholly circumstantial evidence. Accordingly, the fact that the evidence establishing a defendant's participation in a crime is circumstantial does not preclude a conviction where the evidence coupled with the reasonable inferences drawn therefrom overcomes the presumption of innocence. Significantly, we may not substitute our judgment for that of the fact finder; thus, so long as the evidence adduced, accepted in the light most favorable to the Commonwealth,

25

> demonstrates the respective elements of a defendant's crimes beyond a reasonable doubt, the appellant's convictions will be upheld.

*Commonwealth v. Pettyjohn,* 64 A.3d 1072, 1074 – 75 (Pa.Super. 2013) (quoting *Commonwealth v. Pedota,* 64 A.3d 634, 635 – 36 (Pa.Super. 2013), additional citations omitted).

This court's recitation factual background of this case was gleaned from the trial transcripts. *See* Section I, *supra.* It is clear, without the need for extensive recitation of all the evidence presented, that the Defendant's contention is without merit.

To sustain a conviction for Aggravated Assault, the Commonwealth was required to prove beyond a reasonable doubt that the Defendant attempted[17] to cause serious bodily injury to another person. *See* 18 Pa.C.S. § 2702(a)(1). Joseph King's testimony alone, viewed in the light most favorable to the Commonwealth, was sufficient to support the verdict.

King testified that he was directed by Cobb to search for the person ("Black") responsible for stabbing Cobb. *See Tr.2,* p. 45. After locating the person he believed to be "Black," King notified Cobb and met up with Cobb, Troskoski, and the Defendant in the

---

[17] There is no dispute the Defendant did not cause serious bodily injury to Ballard.

parking lot of the Rotary Club. *See Tr.2*, p. 46. Cobb gave King a gun, and they all drove to a nearby alley. *See Tr.2*, pp. 47 – 49.

At that point, the Defendant and King exited the vehicle and began looking for the "Black" on foot. *See Tr.2*, p. 49. They spotted a hooded figure come out of the alley. *Id.* King testified:

> [The Defendant] addressed the figure – well, he aggressively went after this person, told him to come here I believe at that point. He scared the kid pretty bad because the kid started running immediately.

*Tr.2*, p. 50. The Defendant gave immediate chase. *See Tr.2*, p. 50. King observed:

> [The Defendant] chased after him. I remember seeing the kid hop a fence to get through to another alley that took him out on to Potomac, and then the next thing I knew I saw [the Defendant] raise his right arm and I saw like one muzzle flash and at that point I had turned around and started to try to run away and heard a couple more shots after I saw the initial muzzle flash from the end of his extended arm.

*Tr.2*, p. 50.

This evidence alone is sufficient to sustain a conviction for attempting to cause serious bodily injury to the victim. Aggressively confronting someone, chasing them, and firing a gun at them

27

multiple times, is more than sufficient to sustain a finding by the jury that the Defendant intended to cause serious bodily injury to the victim, and took a substantial step to cause such a result.

To be guilty of Conspiracy, the Commonwealth was required to prove beyond a reasonable doubt that the Defendant, with the intent of promoting or facilitating a crime, agreed with one or more other persons that one or more of them "will engage in conduct which constitutes such crime or an attempt or solicitation to commit such crime." 18 Pa.C.S. § 903(a)(1). Further, the Commonwealth was required to prove that an "overt act in pursuance of such conspiracy" was committed by the Defendant or another member of the conspiracy. 18 Pa.C.S. § 903(e)

Taking these elements in reverse order, it is quite clear that the Commonwealth established the overt act in furtherance of a conspiracy to commit first degree murder. As we outlined above in Joseph King's testimony, and in Section I, *supra*, the Commonwealth established the Defendant shot a firearm at Ballard multiple times after confronting him in the alley near Rutter's. In addition, both King and Troskoski testified that they met up with the Defendant and Cobb with the mutual understanding that they

28

were going to search for and kill the person responsible for stabbing Cobb. They were all provided with handguns and drove together in the area of Rutters looking for the person responsible for stabbing Cobb. This evidence, separately or taken together, is sufficient to establish an overt act in furtherance of the conspiracy to commit murder.

In regards to an agreement to commit first degree murder, the Commonwealth also presented sufficient evidence. King testified that Cobb was upset and angry about being robbed/stabbed. *See Tr.2*, p. 45. Cobb told King that "if [he] could find these people that did it to let him know." *Id.*

After finding individuals King believed to be responsible, he informed Cobb by telephone. *See Tr.2*, p. 46. A short time later, Cobb, Troskoski, and the Defendant met up with King. *Id.* When King entered the vehicle, he described the mood of everyone as "tense." *Tr.2*, pp. 46 – 47.

Cobb asked King if he had "for sure" seen "these guys." *See Tr.2*, p. 47. After confirming what King had seen, Cobb handed King a firearm. *Id.* King testified:

> When he handed me that firearm I pretty much understood what the implication was. I figured at some point a weapon was going to be fired. The implication was to go – you know, go after these people by any means, whatever it takes.

*Tr.2*, pp. 47 – 48. King understood the implication was "to shoot at the person or shoot the person." *Tr.2*, p. 48.

All four involved then drove to another area nearby, and the Defendant and King exited the vehicle. *Tr.2*, p. 49. The Defendant's subsequent actions in shooting at Ballard were previously set forth above. *See* SECTION I, *supra.*

Troskoski testified that Cobb directed him to retrieve a duffle bag containing guns; at that time, Troskoski understood this directive to be in furtherance of killing the person responsible for stabbing Cobb. *See Tr.2*, p. 99. When Troskoski, Cobb, King and the Defendant met in the parking lot at the Rotary Club, Troskoski testified:

> COMMONWEALTH: Now, at some point when all four of you were in the car, tell me what happens next?
>
> TROSKOSKI: After we entered the car?

30

COMMONWEALTH: Yes, when all four of you were inside the car?

TROSKOSKI: I was directed to drive behind the alley that's behind Rutter's.

COMMONWEALTH: Directed by whom?

TROSKOSKI: Anthony.

COMMONWEALTH: Ant?

TROSKOSKI: Yes.

COMMONWEALTH: And tell me what happened with those guns?

TROSKOSKI: He handed Brandon one and then handed Joey one.

COMMONWEALTH: What did he say when he handed over those guns?

TROSKOSKI: I can't recall exactly.

COMMONWEALTH: Do you recall him saying something like take care of business?

TROSKOSKI: Yes.

**COMMONWEALTH: And, again, what was your understanding of when Ant said that as he handed out the**

31

**guns? What was going to go down?**

**TROSKOSKI:** **To shoot the guy that stabbed him.**

*Tr.2*, pp. 99 – 100 (emphasis added). Considering the totality of the evidence presented, with particular consideration of the testimony set forth above, this court has little trouble concluding the Commonwealth presented sufficient evidence of a conspiracy, that the goal of the conspiracy was to commit the crime of first degree murder, and that an overt act was committed in pursuit thereof.

The Defendant's next claim of error is:

> Was the verdict of guilty on the Aggravated Assault and Conspiracy to Commit First Degree Murder [against] the weight of the evidence?

*Concise Statement*, ¶ 8. A challenge to the weight of the evidence must be raised in the trial court in the form of a motion for a new trial. *See* Pa.R.Crim.P. 720(B)(1)(a)(iv); *see also, e.g.,* *Commonwealth v. Washington*, 825 A.2d 1264 (Pa.Super. 2003). The Defendant properly raised this claim in his post-sentence motion. *See Post-Sentence Motion*, ¶¶ 3(b), 18, 20.

32

Because the Defendant is required to raise this issue in the trial court, and because this court denied the claim, the Defendant's claim on appeal is in reality a challenge to this court's ruling. *See Order of Court*, January 2, 2019.

A challenge to a verdict as against the weight of the evidence is committed to the sound discretion of the trial court. *See Commonwealth v. Clay*, 64 A.3d 1049, 1054 (Pa. 2013), additional citations omitted. The standard for evaluating a challenge based on the weight of the evidence is well-settled:

> A new trial should not be granted because of a mere conflict in the testimony or because the judge on the same facts would have arrived at a different conclusion. Rather, the role of the trial judge is to determine that notwithstanding all the facts, certain facts are so clearly of greater weight that to ignore them or to give them equal weight with all the facts is to deny justice. It has often been stated that a new trial should be awarded when the jury's verdict is so contrary to the evidence as to shock one's sense of justice and the award of a new trial is imperative so that right may be given another opportunity to prevail.

*Clay*, 64 A.3d at 1055, internal quotations and citations omitted. Further, "one of the least assailable reasons for granting or denying a new trial is the lower court's conviction that the verdict was or

33

was not against the weight of the evidence and that a new trial should be granted in the interests of justice." *Commonwealth v. Widmer*, 744 A.2d 745, 753 (Pa. 2000), additional citations omitted.

The Defendant argued to this court that the verdict was against the weight of the evidence because there was no evidence the Defendant actually fired his gun at the victim. *See Post-Sentence Motion*, ¶ 17. Because the bullet holes in surrounding buildings were above the height of the victim, the Defendant argues that it is clear the Defendant was not trying to shoot the victim. *Id.*

These facts are not clearly entitled to greater weight than accorded by the jury. To focus on the height of the bullet holes in the surrounding buildings, as clear evidence of a lack of intent to kill (murder) or lack of intent to cause serious bodily injury (aggravated assault) would require the jury, and now this court, to ignore the significant evidence of a contrary intent. We've outline the significant evidence previously in this opinion detailing the goal of King, Troskoski, Cobb, and the Defendant that night. They were hunting the person responsible for stabbing Cobb. Cobb handed everyone guns and told them to "take care of business." The Defendant was immediately aggressive when he made contact with

34

the victim; he gave immediate chase when the victim ran. As the victim was escaping over a fence into an adjacent alley, the Defendant raised his gun and fired multiple shots towards the victim.

We denied the Defendant's request for a new trial because all the evidence presented significantly outweighed any argument concerning the height of the bullet holes, or the fact that the victim as not actually injured. The evidence convincingly established the intent of the four individuals involved with the shooting that night and this court's opinion is firm that the verdicts of guilt do not "shock" our conscience. No manifest injustice has been visited upon the Defendant by the jury's weighing of the evidence as they did.

The Defendant's final claim on appeal is:

> The Honorable Trial Court committed an error of law by allowing hearsay statements that were testimonial in nature of Corey Ballard to be introduced as evidence thereby violating Defendant's right to confront his accuser.

*Concise Statement,* ¶ 9(a). Again, we cannot discern the precise nature of the Defendant's claim of error. Based upon his claim of a right to confront his accuser, we presume the Defendant is

35

asserting a violation of the United States Constitution, VI Amendment; under this provision, the Defendant had a constitutional right to be "confronted with the witnesses against him." U.S. Const., VI Amendment (hereinafter "6th Amendment"). It is difficult to examine this claim because, upon the court's review of the record, this issue was never raised. The objections lodged by the Defendant during trial were based upon hearsay; he made no assertion of a violation of his constitutional right. *See Tr.2*, pp. 5 – 7. This claim was not raised in the Defendant's *Post-Sentence Motion*.

Consequently, we cannot opine on a reason for our decision when, in fact, this court was never presented with a claim under the 6th Amendment. The objection we overruled was based upon hearsay, as we discussed previously in this opinion. However, to the extent this issue is properly preserved or subsumed within a general hearsay objection, we conclude under the circumstances outlined previously in this opinion, that the excited utterance at issue does not fall within those prohibited by the 6th Amendment. *See, e.g., Commonwealth v. Gray*, 867 A.2d 560, 572 – 77 (Pa.Super. 2005).

# IN THE COURT OF COMMON PLEAS OF THE 39TH JUDICIAL DISTRICT OF PENNSYLVANIA – FRANKLIN COUNTY

| | | |
|---|---|---|
| **COMMONWEALTH OF PENNSYLVANIA** | : | CRIMINAL ACTION |
| | : | |
| | : | CP-28-CR-0000342-2017 |
| V. | : | |
| | : | **JUDGE JEREMIAH D. ZOOK** |
| | : | |
| **BRANDON JALON MAZE,** | : | |
| | : | |
| DEFENDANT | : | |

## ORDER

**NOW**, this 14th day of March, 2019, **IT IS HEREBY ORDERED** that the Franklin County Clerk of Courts transmit the forgoing *Opinion Sur. Pa.R.A.P. 1925(a)* and the record of these proceedings to the Prothonotary of the Superior Court of Pennsylvania pursuant to Pa.R.A.P. 1931(c).

By the Court,

JUDGE JEREMIAH D. ZOOK

**The Clerk shall give notice to:**
District Attorney's Office (J. Faust, Esq.) – Counsel for the Commonwealth
K. Taccino, Esq. – Counsel for the Defendant

**BRANDON JALON MAZE**                    Case No.       342-2017


On March 15, 2019, I Barbara E. Black served a copy of the Opinion and Order signed on March 14, 2019 by the Honorable Jeremiah D. Zook and filed on March 15, 2019, on the following persons by the following method:



**Interoffice Mail:**

Franklin County
District Attorney's Office

Kevin Taccino, Esquire


_Barbara E. Black_
Deputy Clerk of Courts